**HOOSIER INSURANCE CO.,**
**Appellant–Defendant,**

v.

**NORTH SOUTH TRUCKING SUPPLIES,**
**INC., Appellee–Plaintiff.**

No. 25A03–9602–CV–67.

Court of Appeals of Indiana.

Aug. 29, 1997.

George E. Martz, Robert A. Durham, Rocap, Witchger & Threlkeld, Indianapolis, for Appellant–Defendant.

Alan D. Burke, Rochester, for Appellee–Plaintiff.

## OPINION

HOFFMAN, Judge.

Appellant-defendant Hoosier Insurance Company brings this appeal from the trial court's decision to deny Hoosier's motion for judgment on the evidence. The facts relevant to the appeal are set forth below.

In December of 1990, Lisa Ann Shoemaker's husband was killed in an automobile accident. Shortly after his death, Lisa received approximately $160,000 from an insurance policy her husband held. With the insurance proceeds, Lisa purchased a home for $50,000 and a car for $10,000. She then invested the balance of the proceeds in four bank funds, one being a retirement fund.

In August of 1991, Lisa began to date Scott Casey. At some point during their relationship, Lisa discussed with Scott her financial situation.

Through her relationship with Scott, Lisa was introduced to Scott's parents, John Norman Casey (Norman) and Carol Casey. As a result of becoming acquainted with the Casey family, Lisa learned that Norman worked as a salesman for Vaughn Goodspeed, who owned and operated a business that sold supplies to truck stops.

In January of 1992, Norman, Carol, Scott and Lisa were gathered at Norman's home. The topic of conversation turned to Vaughn Goodspeed's business and the fact that Vaughn was going out of business. Norman commented that he thought the business would be a good investment and that if he had the money, he would like to take over the business. Carol then asked Lisa how much money she had and if she would be interested in investing in the business. Lisa replied that she had approximately $70,000. Norman told Lisa that she could potentially triple her investment if she invested in the business.

A few days later, Lisa agreed to invest in the business. Because Norman did not have any cash to invest in the business, he supplied a building that he was buying on contract. The company Norman and Lisa formed was called North South Trucking Company.

After agreeing to invest in the business, Lisa went to the bank to withdraw the $70,000. Because she was told that the transaction would take several days, Lisa immediately wrote three checks to Norman at $2,000 each. Lisa was told that the $6,000 would be used for buying inventory to keep the truck stops supplied. The inventory was stored in Norman's building.

When Lisa's transaction to withdraw the $70,000 was completed, she opened a savings and a checking account at the Farmers and Merchants Bank, at Norman's request, and deposited $69,000 between the two accounts. Both Lisa and Norman were eligible to write checks on the accounts.

Norman then suggested that the new business he and Lisa were starting be incorporated. When the corporation was formed, Lisa was named president and Norman was named secretary of North South Trucking Supplies, Inc. (North South). Lisa owned 100 percent of the shares of the corporation. No one else had an ownership interest in the corporation.

Lisa, who knew very little about the supply business, helped with daily packaging of inventory. Occasionally, Lisa would write a check; however, Norman wrote most of the checks, performed the accounting for the business, and monitored the accounts payable and receivable. Norman acted as the salesman for the business and determined what inventory and how much inventory should be ordered. Norman did not consult with Lisa before he made his decisions. Instead, he informed her of what decisions he made.

On April 17, 1992, Norman purchased an insurance policy on North South's inventory with coverage totaling $65,000. On May 4, 1992, Norman made a telephone call to his insurance agent and informed him that, upon performing a final inventory check, Norman had determined that the total value of the

inventory was $95,000 instead of $65,000. That same day, the insurance agent increased the policy limit to $95,000.

In the early morning hours of May 6, 1992, a fire occurred in the building in which North South stored its inventory. Norman was the last person to leave the building containing the inventory before the fire began. Norman testified that he left the building at 12:30 A.M. and locked the doors. Shortly after 3:00 A.M., the Fulton County Sheriff's Department received a report of the fire. When the fire department arrived, the firefighters found the doors to the building locked.

Before the fire could be suppressed, a large portion of the house and the attached block warehouse were damaged. After inspecting the remains of the buildings, an Indiana State Fire Marshal investigator determined that the fire was intentionally set. An investigator for Barker Herbert Laboratories reached the same conclusion and further testified that, in his opinion, Norman was the most likely suspect.

In the months following the fire, Norman attempted to determine the amount of loss suffered by North South. On October 5, 1992, a sworn statement in proof of loss form, created by Norman and signed by Lisa, was submitted to the insurance carrier, Hoosier Insurance Company (Hoosier). The proof of loss form claimed that the actual cash value of the property at the time of the loss was $101,124.86.

Hoosier considered the claim submitted by Lisa and Norman. As part of its investigation, Hoosier hired Stephen Meils, a certified public accountant, to do an account analysis of North South's inventory at the time of the fire. Meils determined the value of the inventory to be $36,000. Based upon Meils' finding and pursuant to the following language in North South's policy, Hoosier denied the claim:

The CONCEALMENT, MISREPRESENTATION OR FRAUD Condition is replaced by the following:

CONCEALMENT, MISREPRESENTATION OR FRAUD

We will not pay for any loss or damage in any case of:

1. Concealment or misrepresentation of a material fact or

2. Fraud

committed by an insured at any time and relating to a claim under this policy.

The claim was denied in December 1992, on the basis that the fire was intentionally set and that Norman and Lisa misrepresented the actual value of the property lost in the fire.

On February 22, 1993, North South filed suit against Hoosier seeking an amount equal to the value of the inventory lost in the fire. In March of 1993, North South hired Virga Smith, a certified public accountant, to determine the value of the inventory lost in the fire. Smith determined the value of the inventory to be $35,585.82. On April 30, 1993, North South filed an amended complaint adding Norman as a defendant.

The case was tried to a jury in November of 1995. During the trial, Norman was dismissed as a party to the action. At the close of the trial, Hoosier made a motion for judgment on the evidence arguing that Norman and Lisa, in filing the claim for $101,124.86, deliberately inflated the value of the inventory lost in the fire. Although the trial court took the motion under advisement, it nevertheless submitted the case to the jury.

On November 16, 1995, the jury returned a verdict in favor of North South and awarded the corporation $36,175. On November 27, 1995, the trial court entered judgment upon the jury verdict and denied Hoosier's motion for judgment on the evidence. Hoosier appeals the trial court's decision.

The following issues, as restated, are raised for our review:

(1) whether the trial court erred in denying Hoosier's motion for judgment on the evidence; and

(2) whether the trial court committed reversible error in refusing to give Hoosier's tendered instructions.

■ Hoosier claims that the trial court erred when it overruled its Ind.Rules of Procedure, Trial Rule 50(A) motion for judgment

on the evidence filed at the close of all the evidence. Hoosier contends that North South's claim should be excluded from coverage because the evidence presented at trial was without conflict and susceptible only to the inference that North South made misrepresentations of material fact in its sworn statement in proof of loss form.

 Motions for judgment on the evidence (directed verdict) are governed by T.R. 50.[1] Pursuant to that rule, a defendant's motion for judgment on the evidence made at the close of the plaintiff's evidence or at the close of all the evidence should be granted only in the absence of evidence or reasonable inference on at least one essential element of the plaintiff's claim. *Freson v. Combs*, 433 N.E.2d 55, 61 (Ind.Ct.App.1982). The evidence must be without conflict and susceptible to but one inference, that being in favor of the moving party. *Id.* In examining the evidence, the trial judge must draw all fair and rational inferences in favor of the party opposing the motion and give that party every favorable intendment of the evidence. *Id.* The court may not substitute its judgment for that of the jury on questions of fact nor grant the motion because the evidence decidedly preponderates in favor of the moving party. *Id.*

 Appellate review of rulings on motions for judgment on the evidence is subject to the same standards which govern the trial court in ruling on the motion. *Id.* Our task therefore is to determine whether there was any evidence justifying submission of North South's claim against Hoosier to the jury. *See Hendrickson & Sons Mtr. Co. v. Osha*, 165 Ind.App. 185, 207–208, 331 N.E.2d 743, 757 (1975).

North South's complaint contained an allegation that Hoosier breached its fiduciary obligation to North South by denying North South's claim seeking reimbursement for the inventory lost in the fire. Hoosier's answer countered that because North South submitted a sworn statement in proof of loss form that was false and misleading, in that it overstated the value of the inventory and the actual loss claimed, the insuring agreement was void. Hoosier, predicated upon the clause in the policy denying to the insured the right of recovery "in any case of: 1. Concealment or misrepresentation of a material fact or 2. Fraud," specifically argues that North South is not entitled to a recovery because the fire resulted from the wrongful and fraudulent act of North South's secretary, who at the time was in complete charge and control of the company.

The general rule is set forth in 43 Am. Jur.2d, Insurance, § 494, p. 565:

> As a general rule, the wilful burning of property by a stockholder of a corporation is not a defense against the collection of insurance by the corporation; nor can a corporation be prevented from collecting the insurance because its agents wilfully set fire to the property without the participation or authority of the corporation or of all the stockholders of the corporation. On the other hand, if there is a conspiracy among the stockholders of a corporation to burn the property of the corporation, and the property is burned in pursuance of the conspiracy, such act is chargeable to the corporation and is a good defense to an action on a fire insurance policy. Likewise, under the principle of law that no one should be allowed to profit by his own wrong, an insured corporation will not be allowed a recovery on fire insurance policies where the incendiarist owns all or practically all of the stock in the insured corporation, or is in exclusive management of the corporate property.

 In the instant case, the first question we are presented with becomes whether

---

1. T.R. 50(A) reads in pertinent part:

 (A) **Judgment on the Evidence–How Raised–Effect.** Where ... some of the issues in a case tried before a jury ... are not supported by sufficient evidence ..., the court shall withdraw such issues from the jury and enter judgment thereon.... A party may move for such judgment on the evidence:

 (1) after another party carrying the burden of proof or of going forward with the evidence upon any one or more issues has completed presentation of his evidence thereon; or
 (2) after all the parties have completed presentation of the evidence upon any one or more issues; or
 (3) after all the evidence in the case has been presented and before judgment[.] ...

Hoosier should be allowed to deny payment to a corporation such as North South for a fire loss when evidence demonstrates that the corporation's secretary, who was in substantial control of the management of the corporation, willfully set the fire. The majority of jurisdictions that have considered the question of whether the wrongful acts of a shareholder, officer and director will bar recovery by a corporate insured have held that an arsonist's status as an officer, stockholder, employee or agent of an insured corporation does not necessarily preclude recovery by a corporate insured on an insurance policy. *See, e.g., Miller & Dobrin Fur. Co. v. Camden Fire Ins. Co. Ass'n,* 55 N.J.Super. 205, 150 A.2d 276 (1959); *Erlin–Lawler Enterprises, Inc. v. Fire Insurance Exchange,* 267 Cal.App.2d 381, 73 Cal.Rptr. 182 (1968); *Continental Ins. Co. v. Gustav's Stable Club,* 211 Neb. 1, 317 N.W.2d 734 (1982).[2] Rather, the cases suggest that an analysis must be made to determine whether the arsonist exercised *absolute control* in the conduct of the corporation's business or stood to benefit from its recovery. The rationale underlying the denial of recovery in such cases is that, when a corporation has relinquished control of its affairs to a single individual, it is deemed to have acquiesced in or ratified the wrongful acts of that individual. *Minnesota Bond v. St. Paul Mercury Ins. Co.,* 72 Or. App. 187, 695 P.2d 579, 582 (1985), *rev'd on other grounds by* 300 Or. 85, 706 P.2d 942 (1985). Conversely, when the corporation has not explicitly or implicitly authorized the acts of the wrongdoer, recovery should be allowed. *Id.* In each instance, the basic function of the court is to see that no one profits by wrongdoing. *See Erlin–Lawler,* 267 Cal.App.2d 381, 73 Cal.Rptr. 182.

In *Miller & Dobrin,* 55 N.J.Super. 205, 150 A.2d 276, the court was asked to determine whether arson by a 50 percent shareholder, officer and director barred corporate recovery under an insurance policy. Before concluding that it did, the court set out this rule:

Before the stockholders, who may be innocent of wrongdoing, can be precluded from recovery, the court must be convinced ...

that the corporate fiction should be disregarded. This, in turn, requires a finding that [the arsonist] was the dominant force in the affairs of [the corporation], and that the other parties in interest in the corporation permitted him to so control the affairs of the corporation that legally they may be held responsible for his acts and precluded from recovering for his wrongdoing.

150 A.2d at 282. Although the amount of stock owned by the arsonist was a factor in the court's decision, it emphasized that recovery was properly denied only because the arsonist "largely dominated the affairs of the [corporation]" and because, in reality, the business was operated as a partnership. 150 A.2d at 284–86.

In *Erlin–Lawler,* 267 Cal.App.2d 381, 73 Cal.Rptr. 182, a corporate insured challenged the trial court's conclusion that it was precluded from recovering under a fire insurance contract, because the arsonist, a 50 percent stockholder, was the corporation's "alter ego." In holding that that conclusion was not supported by the findings or the evidence, the court noted that, under the lower court's finding that the arsonist owned 50 percent of the stock at the time of the fire, he would not be the controlling shareholder. 73 Cal.Rptr. at 186. Thus, although the arsonist stood to benefit at least to the extent of 50 percent of the recovery, that fact alone apparently was not determinative. The court also stated that, in the light of the evidence that the two 25 percent shareholders took an active role in the corporation, it could not be inferred from the arsonist's status as president that he was in dominant control of the corporation. 73 Cal.Rptr. at 186. Because a finding that 50 percent of the shares were held independently of the arsonist was also at odds with the lower court's conclusion that the arsonist was the alter ego of the corporation and would benefit substantially by a recovery, the court remanded the case for further resolution of the issues.

In *D.I. Felsenthal Co. v. Northern Assur. Co.,* 284 Ill. 343, 120 N.E. 268 (1918), the Supreme Court of Illinois concluded that a

---

**2.** Although this Court is not bound by the decisions of foreign jurisdictions, where no Indiana cases have addressed the issue, decisions of other states are instructive.

corporation should not be allowed to recover on a policy for the destruction of corporate property when the fire was set by an individual who was the beneficial owner of practically all of the stock in the corporation and who had absolute management and control of its affairs and its property, was the sole creditor of the corporation, was the equitable owner of all of the property of the corporation, and was the only person who would benefit financially from the fire. 120 N.E. at 271. In *Kimball Ice Co. v. Hartford Fire Ins. Co.*, 18 F.2d 563, 567 (4th Cir.1927), the court found insurance fraud would be encouraged if the corporation could simply turn control over to a single person, who could effect the willful burning of the insured's premises, and then assert a claim of innocence on the part of the other shareholders. The court specifically opined that:

> Whatever there may be in these distinctions, they should not avail where the general manager, who took out the insurance, was the sole representative of all the parties connected with the corporation, and who entirely directed, managed, and controlled the same, and in which he was personally largely interested as a stockholder. If recovery could be had in the present instance, all that would be necessary would be to turn over the property of a corporation to the exclusive management and control of a single person, who could procure insurance fraudulently and effect the willful burning of the insured premises, and assert a mere claim of innocence on the part of those interested in the company, who would thereby secure the benefit of the direct fraud.

*Id.* at 567.

In *United Gratiot Furn. v. Basic Prop. Ins.*, 159 Mich.App. 94, 406 N.W.2d 239 (1987), the Michigan Court of Appeals was faced with the question in what situations should an insurance company be allowed to deny payment to a corporation for a fire loss when evidence demonstrates that a shareholder willfully set the fire. The court in *United Gratiot*, in finding that the corporation was liable for the arsonist acts of a shareholder who controlled the management and the operation of the corporation, held

that an insurance carrier may assert arson as a defense against a corporation's claim of fire loss if it is factually demonstrated that the individual who set or procured the setting of the fire exercised complete dominance and control over the affairs of the corporation. *Id.* at 242. In so holding, the court clarified its determination stating that:

> The rule which we have adopted applies only in situations where the incendiarist has pervasive control over the corporation. Thus, the incendiarist would control the disposition of the insurance proceeds which the corporation would receive. In all probability, he or she would keep the proceeds within the corporation. In that event, the shareholders who were not involved would not see any of the insurance funds even if the corporation were paid. By using the corporate cloak in this manner, the arsonist could retain and personally enjoy the benefits of the proceeds contrary to the equitable principles upon which our decision is based.

*Id.* at 242.

In *Continental Ins. Co. v. Gustav's Stable Club*, 211 Neb. 1, 317 N.W.2d 734 (1982), the Supreme Court of Nebraska held that the insured corporation would not be allowed to recover on its fire insurance policy where the incendiarist owned half of the stock and was in dominant management of the corporate property. Relying upon, *inter alia*, *Erlin-Lawler*, *Kimball Ice Co.*, and *Miller & Dobrin*, the court concluded that:

> [T]he action of the trial court in denying recovery to the defendant corporation on the fire policy is not only supported by public policy but also on the basis of the facts in the case showing that the instigation of the arson of the property was the act of its president, Gustav Platz, who was also one of the two sole directors of the corporation and an equal stockholder therein, and without question the dominant force in running the corporation at and prior to the time of the burning of the property. As previously demonstrated, both he and his ex-wife, Nancy, [the other shareholder,] stood to gain financially from the payment of the insurance proceeds by

Continental [Insurance Company] had such payment been made.

*Id.* at 740.

■ The principles set forth in the cases enumerated above tell us that a corporation will not be precluded from recovery simply because the arsonist owns 50 percent of its stock. It appears that the point on which the decision turns is the degree of control which the incendiarist exerts over the affairs of the corporation, and whether the incendiarist stands to gain from his wrongdoing. If the individual who set or procured the setting of the fire dominates the corporation to such an extent that he has exclusive control over the corporation and stands to gain from his wrongdoing, the corporation is precluded from recovering benefits under its fire insurance policy. *United Gratiot,* 406 N.W.2d at 241. However, in instances where it is not shown that the incendiarist had exclusive control over the corporation and stood to gain from his wrongdoing, insurers are not permitted to deny coverage. *See Erlin–Lawler,* 267 Cal.App.2d 381, 73 Cal.Rptr. 182; *Fidelity–Phenix Fire Ins. Co. v. Queen City Bus & Transfer Co.,* 3 F.2d 784 (4th Cir. 1925) (where the court held that, although the mortgagee of corporate property protected by fire insurance policies owned one-fourth of the corporation's stock and was its president, his actions were not imputable to the mortgagor corporation because he was not a substantial owner).

■ Furthermore, under cases that have analyzed the right to recover in terms of whether the arsonist stood to benefit, the only rule enunciated in those terms is that, if the arsonist owns all or substantially all of the corporate stock, recovery will be denied, because any benefit would redound solely to the wrongdoer. *See Erlin–Lawler,* 267 Cal. App.2d 381, 73 Cal.Rptr. at 185; *Miller & Dobrin,* 55 N.J.Super. 205, 150 A.2d 276, 283; *D.I. Felsenthal,* 284 Ill. 343, 120 N.E. 268. Without evidence that the other stockholders acquiesced in the arsonist's conduct, the corporation is innocent of wrongdoing and should be allowed to recover for its loss.

Turning now to the instant case, the record discloses that after the incorporation of North South, Lisa was named the president and Norman was named the secretary of the corporation. Lisa owned 100 percent of the shares of the corporation as she had invested all of the capital in the business. Norman did not have an ownership interest in the corporation.

During trial, Lisa testified that although she was not familiar with the truck stop supply business, she nevertheless participated in the business. Lisa worked in the business five days per week and learned how the business operated. Lisa's daily duties included packaging inventory, receiving supply deliveries from United Parcel Service (UPS), and shipping orders to the customers. Occasionally, Lisa would write checks for incoming supplies. Lisa also testified that she and Norman would have periodic meetings to discuss how the business was running.

Because Lisa knew little about operating the business, Norman acted as the salesman, determined the inventory to be ordered, and managed the accounting. Norman also purchased the insurance on the inventory. Although Lisa knew that Norman had procured insurance, she did not become aware that the policy limit on the inventory had been raised until after the fire occurred.

Several months after the fire occurred, Lisa retrieved the corporation's accounting books from Norman. Of the $69,000 that she had originally invested in the business, she was left with approximately $87. At the time of trial, the corporation still owed money to its creditors.

From the evidence presented during the trial, it is clear that Lisa did not participate in, assent to, or in any way ratify Norman's actions. Lisa testified that she did not authorize Norman to set fire to the inventory. Although Lisa was a neophyte regarding the truck stop supply business, she worked five days per week in various capacities learning the business. Lisa did not manage the accounting of the business; however, she helped with packaging, sent and received inventory, and occasionally wrote checks. Lisa supplied all the capital needed to start the business and was the only person to possess an ownership interest in the business. The only property Norman invested in

the business was a building he was purchasing on contract. Lisa was the sole stockholder of the corporation. Norman owned no ownership interest in the corporation. Moreover, Norman was terminated as secretary of the corporation in January of 1993. Thus, Norman will receive no direct or indirect benefit from his wrongdoing.

Based upon the evidence presented, it is apparent that North South as a corporation neither explicitly authorized Norman's acts nor implicitly ratified them by allowing him to dominate corporate affairs. Furthermore, it is clear that Norman will not benefit in any way from North South's recovery of the insurance proceeds. Thus, under our standards of review, we cannot say that the evidence was without conflict and susceptible of but one inference, that being in favor of Hoosier.

Nevertheless, we are still faced with a second question which becomes whether North South's insurance policy is void based upon the following policy language:

The CONCEALMENT, MISREPRESENTATION OR FRAUD Condition is replaced by the following:

CONCEALMENT, MISREPRESENTATION OR FRAUD

We will not pay for any loss or damage in any case of:

1. Concealment or misrepresentation of a material fact or

2. Fraud

committed by an insured at any time and relating to a claim under this policy.

Relying upon the above clause, Hoosier argues that it was relieved of its obligation to pay North South's claim because Norman, while acting within the scope of his duties as a corporate officer, submitted a false proof of loss form that stated a claim nearly three times over the actual loss. North South contends that it is entitled to recover under the policy because Norman was acting outside the scope of his authority when he submitted the false proof of loss form. Thus, according to North South, Norman's wrongdoing should not be imputed to the corporation.

In general, under certain circumstances, the wrongful acts of one insured under a fire policy are not imputed to other innocent co-insureds to whom recovery is still available. *See American Economy Ins. Co. v. Liggett,* 426 N.E.2d 136 (Ind.Ct.App.1981) (held that even if the co-insured husband did intentionally start the fire, wife was still entitled to coverage because husband, who had died in the fire, was no longer insured, and because wife was absent from the home at the time of the fire and was entirely innocent of any wrongdoing). Whether or not there is recovery depends upon whether the co-insureds' obligations and interests are considered to be joint or severable. *Iemma v. Adventure RV Rentals, Inc.,* 632 N.E.2d 1178, 1182 (Ind.Ct.App.1994). If rights and obligations are deemed to be joint, then recovery is generally not allowed. *See* Schaefer *(Right Of Innocent Insured To Recover Under Fire Policy Covering Property Intentionally Burned By Another Insured)*, Annotation, 11 A.L.R.4th 1228, 1229 (1982). When they are severable, then the wrongful acts of one co-insured are not imputable to other innocent co-insureds and recovery is possible. *Id.* at 1231.

An insurance policy is a contract. *Iemma,* 632 N.E.2d at 1182. Thus, it is subject to the same rules of interpretation as are other contracts. *Id.* The purpose of this Court on appeal is to ascertain and enforce the intent of the parties to the policy. *Id.*

On the policy, North South is the listed "insured." As such, if North South is deemed to be entirely innocent of wrongdoing, then it is entitled to coverage under the policy. If, however, Norman's submission of the false sworn proof of loss form can be attributed to North South, the corporation would no longer be an innocent co-insured, and the above exclusion would apply to make the entire policy void.

In support of its argument, Hoosier relies upon *Iemma.* In *Iemma,* the owner of a trailer, which was destroyed in a fire as a result of arson committed by Dorman, the president of Adventure RV, a trailer repair company, brought an action against the company and its fire insurer. This Court held, *inter alia,* that Adventure RV was not an

innocent co-insured entitled to coverage for losses sustained as a result of the arson because the president's acts would be attributed to the company. *Iemma*, 632 N.E.2d at 1179. We specifically opined that:

> Although the law does not require one person to foresee the criminal or irrational acts of another, it does not follow that Adventure RV, solely owned and controlled by Dorman, should not be imputed with knowledge of Dorman's acts of arson.... Dorman could not have reasonably thought when he purchased the insurance on behalf of himself and Adventure RV, that coverage would still exist to cover any claims that would arise in the event of his own acts of arson.

*Id.* at 1183–1184. The instant case, however, is distinguishable from *Iemma*.

Here, Lisa is the sole owner of all the stock in North South and is the only person with an ownership interest in the corporation. The evidence discloses that because of her limited knowledge of the truck stop supply business, Lisa worked for the corporation in a limited capacity. Norman, on the other hand, performed the accounting duties and procured insurance for the corporation. After the fire, Norman, alone, calculated the value of the lost inventory. When Lisa was presented with the sworn statement in proof of loss form, she signed it and did not dispute the figures. Lisa testified that she did not question Norman's calculations because she did not know what questions to ask to accurately dispute the proof of loss form figures.

The evidence clearly establishes that Lisa did not authorize Norman to falsify the proof of loss form. Furthermore, because Norman was dismissed from the corporation, there is no prospect of him benefitting either directly or indirectly from his misrepresentation by allowing the corporation to recover under the policy. Unlike the president of Adventure RV in *Iemma*, Norman would not benefit from his wrongdoing if coverage were allowed.

The fraud clause of North South's policy has no application to the circumstances presented in this case. The law's legitimate concern that a wrongdoer not profit by his wrong is not a factor in this case and there is no reason to deny the innocent North South full recovery. We conclude, therefore, that the proposition as to whether Hoosier may deny North South's claim for loss due to the fire based upon Hoosier's contention that Norman was acting on behalf of the corporation when he allegedly set the fire and subsequently submitted the false proof of loss form was a question of fact to be determined by the jury. For this reason, Hoosier's motion for judgment on the evidence was properly denied.

Hoosier next challenges the trial court's refusal to give three of its tendered instructions. Hoosier argues that the trial court committed reversible error in failing to give its tendered Instructions Nos. 2, 3, and 5.

In reviewing the refusal of tendered instructions, we must determine whether: 1) the instruction correctly states the law; 2) the evidence in the record supports giving the instruction, and 3) the substance of the instruction is covered by other instructions. *Shelby Federal Sav. and Loan Ass'n v. Doss*, 431 N.E.2d 493, 501 (Ind.Ct. App.1982).

> It is a well settled rule in Indiana that the trial court may properly refuse requested instructions on any or all phases of the case, although the requested instructions announced correct rules of law, where the propositions therein stated, as far as applicable to the facts of the case, are covered adequately, sufficiently or fully, or where the substance of the instruction is included in the instructions given, or the instructions actually given fully and fairly present the case to the jury. Thus it is proper for the court to refuse an instruction which merely varies the language of a given instruction. There is no necessity for repetition and duplication of instructions or for restatement of the same proposition in other language.

*Prudence Life Ins. Co. v. Morgan*, 138 Ind. App. 287, 302, 213 N.E.2d 900, 909 (1966).

Turning to the present case, Hoosier's tendered preliminary Instruction No. 2 states that:

> The insuring agreement provides for the following exclusion:

'Misrepresentation or fraud.

We will not pay for any loss or damage in any case of:

1. concealment or misrepresentation of a material fact or

2. fraud

committed by an insured at any time and relating to a claim under this policy.'

The trial court's final Instruction No. 5, however, specifically states in pertinent part that: "defendant Hoosier Insurance alleges that the plaintiff Corporation acting through John Norman Casey supplied documentation which was false, misleading or fraudulent and that *the contract provisions exclude payment for any claim based on concealment, misrepresentation of a material fact, or fraud.*" (Emphasis added.)

The substance of Hoosier's tendered Instruction No. 2 was adequately covered by the trial court's final Instruction No. 5 which adequately informed the jury that Hoosier's policy excluded payment for any claim based upon concealment, misrepresentation or fraud. Therefore, the trial court did not err in refusing Hoosier's tendered Instruction No. 2.

■ Hoosier also contends that the trial court erred in refusing it give its tendered Instruction No. 3. Hoosier argues that the trial court should have instructed the jury on the definitions of concealment, misrepresentation, and fraud.

■ It is generally error for a trial court to refuse to define in its instructions technical and legal phrases relevant to material issues of a lawsuit if it is properly requested to do so. *Canfield v. Sandock*, 563 N.E.2d 1279, 1283 (Ind.1990). As used in this instruction, however, "concealment," "misrepresentation," and "fraud" are not technical or legal terms requiring definition. The terms are clearly understandable to any ordinary person. Furthermore, it does not appear that the jury was, in any way, confused by the terms which Hoosier claims needed definition. The trial court's refusal to give Hoosier's tendered Instruction No. 3 was not error.

Hoosier further avers that the trial court erred in failing to give its tendered Instruction No. 5 which reads as follows:

If you find from the evidence that the amount claimed on the Sworn Statement in Proof of Loss is exaggerated and the result of the concealment of material facts, misrepresentation or fraud on the part of Lisa Shoemaker or John Norman Casey individually or in combination, then North South Trucking Supplies, Inc. may not recover, and you should find for the defendant, Hoosier Insurance Company.

■ As read, the instruction assumes that North South could be barred from recovering under the insurance policy if the evidence disclosed that either Norman or Lisa, in their individual capacities, misrepresented the proof of loss form. This instruction is not a correct statement of the law. Tendered instructions which contain an incorrect statement of the law are properly refused. *Nichols v. State*, 542 N.E.2d 572, 575 (Ind.Ct.App.1989). Therefore, the trial court committed no error in refusing Hoosier's tendered Instruction No. 5.

Finding no reversible error, the judgment is affirmed.

Affirmed.

GARRARD, J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Judge, dissenting.

I am unable to agree with the majority's conclusion that Norman did not "dominate corporate affairs" (Op. at 1172) and that Lisa did not allow him to do so. The evidence is to the contrary.

In this regard, I note that the requisite degree of management control is described differently in the various cases. The majority uses the phrases "absolute control" or "exclusive management", but also recognizes that being the "dominant force" or "largely dominat[ing] the affairs of the [corporation]." Op. at 1169 (quoting *Miller and Dobrin Furniture Co. v. Camden Fire Insurance Co. Assn.* (1959) 55 N.J.Super. 205, 150 A.2d 276, 284) will suffice. The same is true of being

in "dominant control of the corporation." Op. at 1169 (citing *Erlin–Lawler Enterprises Inc. v. Fire Insurance Exchange* (1968) 267 Cal.App.2d 381, 73 Cal.Rptr. 182, 186).

Although Norman owned no stock in the corporation, it was agreed that both he and Lisa would financially benefit if the corporation was profitable. Furthermore, as to the day-to-day operation of the business, Lisa acknowledged that, with her approval, Norman was "in total control". Record at 255. He had unrestricted check signing privileges and signed all but three of some 220 checks written upon the corporate account. He bought and controlled the inventory, and he took care of the receipts. It is therefore clear that, in the case before us, Norman was the dominant force in the management of the corporate affairs, if not in total control, and Lisa acknowledged and ratified that control.

Yet I am unable to discern in what manner, if any, Norman might benefit financially from the arson. I am inclined to agree that Norman is not shown to have directly or indirectly benefitted from the burning of the inventory. The loss of inventory was a corporate loss, the financial implications of which would devolve solely upon the sole shareholder, Lisa. Thus, although there are policy implications which suggest that insulating the corporation from the acts of the arsonist may tend to encourage fraud or deception, the applicable legal principles would not preclude recovery by the corporation for its loss were it not for the fraud component of Hoosier's defense.

The majority seems to consider the actual arson and the falsifying of the amount of the insurance loss as inseparable acts insofar as the fraud clause of the policy is concerned. (Op. at 1172–1174). I submit that the falsification of the claim must be considered as a separate and distinct act in applying the fraud provision of the contract. The provision states that the insurer will not pay for any loss in any case of:

1. Concealment or misrepresentation of a material fact or

2. Fraud

committed by an insured at any time and relating to a claim under this policy.

Record at 168.

It cannot be questioned that submission of a claim for $101,124.96 in excess of the actual loss of $36,000 is a gross misrepresentation of a material fact. The claim was prepared and signed by Norman, who was the secretary of the corporation. Given his management control over the inventory, it is unlikely that he believed the $101,000 figure was an accurate reflection of the loss. North South's own accountant testified that the amount claimed "would not have been a possible number." Record at 392. Under these circumstances, the claim was clearly fraudulent. Be that as it may, the claim was a misrepresentation by the insured, North South, and was signed by Lisa Shoemaker, President of the corporation. Whether or not she knew of the accuracy of the claim, she vouched for it and became a party to the misrepresentation. Upon this basis, I would hold that Hoosier appropriately denied the insurance claim.

I would reverse and instruct the trial court to enter judgment upon the evidence in favor of the defendant.