FILED

Sep 30 2019, 8:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEES |
|---|---|
| Michael W. Phelps | Michael B. Langford |
| Phelps Legal Group | R. Jay Taylor, Jr. |
| Bloomington, Indiana | Scopelitis, Garvin, Light, Hanson & Feary, P.C. |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Patrick Humphrey, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Brian Tuck and U.S. Xpress, Inc., <br> *Appellees-Defendants.* | September 30, 2019 <br><br> Court of Appeals Case No. <br> 19A-CT-721 <br><br> Appeal from the Jackson Superior Court <br><br> The Honorable Amy Marie Travis, Judge <br><br> Trial Court Cause No. <br> 36D01-1604-CT-22 |

**Najam, Judge.**

## Statement of the Case

[1]   Patrick Humphrey filed a complaint against Brian Tuck and U.S. Xpress, Inc. (collectively "U.S. Xpress") alleging their negligence in causing a vehicular collision. A jury found in favor of Humphrey and awarded him $40,000 in damages. Humphrey appeals and presents a single issue for our review,

namely, whether the trial court erred when it instructed the jury on his alleged failure to mitigate his damages.

[2] We reverse and remand for a new trial.

## Facts and Procedural History

[3] On February 7, 2016, Humphrey was driving on Interstate 65 in Jackson County when the trailer of a tractor-trailer being driven by Tuck, a U.S. Xpress employee, struck Humphrey's vehicle. Tuck did not realize that the collision had occurred, and he kept driving. Humphrey hit his head on something inside the car, but he kept driving. Humphrey was eventually able to get Tuck's attention, and both drivers pulled over to discuss the collision. A police officer arrived and talked to both drivers. Humphrey told the officer that he did not need medical attention, and Humphrey proceeded to Cedar Rapids, Iowa, where he was attending orientation for a new job. Humphrey's car was drivable despite cracks in the windshield near the "'A' pillar" where the impact with the trailer had occurred. Tr. Vol. 2 at 34.[1]

[4] Once at his hotel in Cedar Rapids, Humphrey noticed a problem with his left eye, and he removed a sliver of glass from that eye. The next day, Humphrey experienced changes in his vision, and he described it as "like looking through a

---

[1] We note that Volume 1 of the transcript is also labeled "Volume 2," and Volume 2 is also labeled "Volume 3." Due to this mislabeling, the parties use different volume numbers to refer to the same volume of transcript. There are two volumes of transcript, and we refer to them as Volume 1 and Volume 2. There is no Volume 3.

piece of cheesecloth." *Id.* at 31. At that point, Humphrey went to a local hospital for medical treatment, and he was referred to an ophthalmologist. The ophthalmologist recommended that Humphrey get an MRI of his brain, which revealed a tumor on his pituitary gland.[2] The ophthalmologist told Humphrey that if he did not undergo surgery to remove the tumor, he might go blind.

[5] Humphrey took a bus back to his home in Atlanta, and, on February 24, he consulted with Dr. John Vender, a neurosurgeon. Humphrey told Dr. Vender that he had been having headaches over the "past month" and that his vision in both eyes was deteriorating. Tr. Vol. 1 at 146. Humphrey did not tell Dr. Vender about the February 7 collision with Tuck. Dr. Vender assessed Humphrey's tumor and found that it was "secreting prolactin," a hormone, which caused his prolactin levels to be "very high." *Id.* at 147-48. Dr. Vender explained that Humphrey had "pituitary apoplexy," which is "an abrupt sudden event that occurs spontaneously in many cases in pituitary tumors, particularly larger ones." *Id.* at 148. Dr. Vender explained that "there are some cases [of apoplexy] associated with trauma." *Id.*

[6] Dr. Vender performed surgery to remove the tumor two days later, on February 26. Thereafter, Humphrey followed up with Dr. Vender, and Humphrey also consulted with Dr. Maximillian Stachura, an endocrinologist. Dr. Stachura explained the impact of Humphrey's high prolactin level (1,000

---

[2] At the ensuing jury trial, a treating doctor explained that Humphrey's pituitary tumor was a pre-existing condition at the time of the collision.

nanograms/millileter) on Humphrey's testosterone level, which was low. Dr. Stachura decided to try to lower the prolactin level with a medication called bromocriptine, which Dr. Stachura prescribed for Humphrey in March. When Humphrey followed up with Dr. Stachura in June, his prolactin level had dropped to 460 ng/mL, and in November, his prolactin level was 431 ng/mL. Humphrey was not consistently taking the bromocriptine as prescribed, both because he could not afford it and because it was causing him to be ill. Humphrey asked Dr. Stachura whether he could prescribe a different medication, and, during a telephone consultation on January 31, 2017, Dr. Stachura advised Humphrey to stop taking the bromocriptine.

[7] As a result of his low testosterone levels, Humphrey experienced a low libido, lethargy, and weight gain. At some point, Dr. Stachura prescribed testosterone injections for Humphrey. Humphrey's symptoms improved significantly with that treatment. Humphrey also reported some vision problems, and an optometrist gave him a prescription for eyeglasses, but Humphrey never got the eyeglasses.

[8] Humphrey filed a complaint against Tuck and U.S. Xpress on April 15, 2016, alleging that their negligence caused him to sustain personal injuries. At trial, U.S. Xpress argued that Humphrey had failed to mitigate his damages because he had not taken the bromocriptine as prescribed by his physicians and because he had never gotten eyeglasses that had been prescribed for him. U.S. Xpress proffered an instruction on a plaintiff's duty to mitigate damages, which the

trial court gave over Humphrey's objection.  The jury found in favor of Humphrey and awarded him $40,000 in damages.  This appeal ensued.

## Discussion and Decision

[9]     Humphrey contends that the trial court erred when it instructed the jury as follows:

> A plaintiff must use reasonable care to minimize his damages after he is injured.  The Plaintiff may not recover for any item of damage that he could have avoided through the use of reasonable care.
>
> The Defendant has the burden of proving by the greater weight of the evidence that the plaintiff failed to use reasonable care to minimize his damages.
>
> Do not consider failure to minimize damages as fault.  Rather you may consider failure to minimize damages to reduce the amount of damages that the plaintiff claims.

Appellant's App. Vol. 2 at 13.

[10]    When we review a trial court's decision to give or refuse a tendered instruction, we consider whether:  "1) the instruction correctly states the law; 2) the evidence in the record supports giving the instruction, and 3) the substance of the instruction is covered by other instructions."  *Simmons v. Erie Ins. Exchange*, 891 N.E.2d 1059, 1064 (Ind. Ct. App. 2008) (quoting *Hoosier Ins. Co. v. N.S. Trucking Supplies, Inc.*, 684 N.E.2d 1164, 1173 (Ind. Ct. App. 1997)).  In determining whether sufficient evidence exists to support an instruction, we will look only to that evidence most favorable to the appellee and any reasonable

inferences to be drawn therefrom. *Id.* We review a trial court's decision to give or refuse to give an instruction for an abuse of discretion. *Id.*

[11] As our Supreme Court has explained,

> "the principle of mitigation of damages addresses conduct by an injured party that aggravates or increases the party's injuries." *Deible v. Poole*, 691 N.E.2d 1313, 1315 (Ind. Ct. App. 1998), (citations omitted), *aff'd*, 702 N.E.2d 1076, 1076 (Ind. 1998). . . . [F]ailure to mitigate damages is an affirmative defense that may reduce the amount of damages a plaintiff is entitled to recover after liability has been found. *Id.* Put simply, a plaintiff in a negligence action has a duty to mitigate his or her post-injury damages, and the amount of damages a plaintiff is entitled to recover is reduced by those damages which reasonable care would have prevented. *Id.* The defendant bears the burden to prove that the plaintiff has not used reasonable diligence to mitigate damages. *Deible*, 691 N.E.2d at 1315 (quoting *Colonial Discount Corp. v. Berkhardt*, 435 N.E.2d 65, 67 (Ind. Ct. App. 1982)). The defendant's burden includes proof of causation, that is, the defendant must prove that the plaintiff's unreasonable post-injury conduct has increased the plaintiff's harm, and if so, by how much.

*Willis v. Westerfield*, 839 N.E.2d 1179, 1187 (Ind. 2006).

[12] In sum, "[t]he affirmative defense of failure to mitigate damages has two elements, and as to both the defendant bears the burden of proof by a preponderance of the evidence." *Id.* at 1188. First, the defendant must prove that the plaintiff failed to exercise reasonable care to mitigate his or her post-injury damages. *Id.* Second, the defendant must prove that the plaintiff's

failure to exercise reasonable care caused the plaintiff to suffer an identifiable item of harm not attributable to the defendant's negligent conduct." *Id.*

[13] Here, Humphrey concedes that the first element was met in that "there was evidence that would create a question of fact for the jury to determine whether or not Humphrey exercised reasonable care to mitigate his post-injury damages." Appellant's Br. at 9. Humphrey asserts, however, that U.S. Xpress did not present evidence sufficient to satisfy the second element, namely, that Humphrey's failure to mitigate his damages caused him to "suffer an identifiable item of harm not attributable to [U.S. Xpress'] negligent conduct, and if so, how much harm or what specific item of harm." *Id.*

[14] U.S. Xpress maintains that the evidence shows that the "discrete, identifiable harm was the continuance of symptoms relating to the hormonal imbalance resulting from Humphrey's failure to take the medication his doctor prescribed, as well as the persistence of his vision problems attributable to his failure to obtain prescription eyeglasses as he was instructed to do." Appellee's Br. at 10. In support of that contention, U.S. Xpress states that Humphrey had been "prescribed medication on June 2, 2016 to correct [his] hormonal imbalance" but that he "did not take the prescribed medication until Dr. Stachura encouraged him to do so . . . on November 2, 2016." *Id.* at 12. U.S. Xpress also points to "[t]he same pattern of treatment avoidance . . . in connection with Humphrey's alleged vision issues." *Id.*

[15] U.S. Xpress misstates and mischaracterizes the evidence. Humphrey was first prescribed bromocriptine in March 2016 and, while he did not take it for some period of time thereafter as prescribed, the undisputed evidence shows that he did take it for a significant period of time and that his prolactin level decreased from 1,000 ng/mL shortly after his diagnosis to 460 ng/mL in June 2016, and it decreased again to 431 ng/mL in November 2016. Dr. Stachura testified that the fact that his prolactin level decreased by that much indicated that he had been taking the bromocriptine. Tr. Vol. 1 at 218. While there was some confusion regarding the date of the prescription and whether Humphrey was taking the medication as prescribed, the undisputed evidence shows that he was taking it consistently during at least six months in 2016, and his prolactin levels had decreased significantly. Further, after Humphrey reported side effects from the bromocriptine, Dr. Stachura advised him to stop taking it.

[16] In any event, U.S. Xpress does not direct us to any evidence that Humphrey's failure to follow his doctors' orders caused him to suffer a "continuance of symptoms" for any specified period of time[3] or that his symptoms were exacerbated in any way. Appellees' Br. at 14. In sum, U.S. Xpress does not direct us to any evidence showing that Humphrey's failure to take the bromocriptine exactly as prescribed "increased [his] harm, and if so, by how

---

[3] U.S. Xpress alleges that Humphrey "took no hormone replacement medication throughout 2017," but in support, it cites to pages 83-84 of the transcript of Humphrey's testimony. Appellees' Br. at 8. We find nothing on those pages to support U.S. Xpress' contention. And U.S. Xpress does not direct us to any evidence showing discrete periods of time where Humphrey's symptoms were exacerbated because of his failure to take medication as prescribed.

much." *See Willis*, 839 N.E.2d at 1187; *see also Buhring v. Tavoletti*, 905 N.E.2d 1059, 1066 (Ind. Ct. App. 2009) (holding that failure to mitigate damages instruction not warranted where plaintiff failed to use prescribed cervical traction device but defendant did not present evidence of a discrete, identifiable harm as a result); *see also Simmons*, 891 N.E.2d at 1070 (holding that failure to mitigate damages instruction not warranted where, "[e]ven if it could be inferred that [plaintiff's failure to take medications or wear prescribed orthotics] somehow increased the harm, Erie has also failed to point to evidence establishing the extent of this increase"). There is insufficient evidence of increased harm to support giving the instruction.

[17] Further, with respect to Humphrey's failure to fill his prescription for eyeglasses, U.S. Xpress does not direct us to any evidence presented at trial regarding alleged vision problems that resulted from Humphrey's failure to get those eyeglasses. Indeed, the evidence shows that Humphrey passed an eye examination in August 2018, without wearing eyeglasses, in order to renew his commercial driver's license. Again, U.S. Xpress has not shown that Humphrey's failure to get the eyeglasses prescription filled caused him any discrete harm.

[18] We hold that the trial court erred when it instructed the jury on Humphrey's failure to mitigate his damages. A party seeking a new trial on the basis of an improper jury instruction must show a reasonable probability that its substantial rights have been adversely affected. *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 944 (Ind. 2001). As our Supreme Court has explained, "[a]n

erroneous instruction merits reversal if it could have formed the basis for the jury's verdict." *Fleetwood Enter., Inc. v. Progressive N. Ins. Co.*, 749 N.E.2d 492, 495 (Ind. 2001). Here, the jury award was a general verdict, and, thus, the erroneous instruction "could have formed the basis for" that verdict. *Id.* Accordingly, we reverse and remand for a new trial on damages only.

[19] Reversed and remanded for a new trial.

Bailey, J., and May, J., concur.