Richard FOSTER, M.D. and the New Castle Clinic, Inc., Appellants–Defendants,

v.

Forrest OWENS, Appellee–Plaintiff.

No. 33A01–0507–CV–329.

Court of Appeals of Indiana.

March 24, 2006.

Rehearing Denied May 16, 2006.

---

David J. Beach, Michele Sullivan, Eichhorn & Eichhorn, Hammond, for Appellants.

George Clyde Gray, Daniel L. Robinson, Gray Robinson Ryan & Fox, Indianapolis, for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Richard Foster, M.D. and The New Castle Clinic, Inc. (collectively, "Dr. Foster") appeal a judgment entered upon a jury verdict awarding damages to Forrest Owens ("Forrest") upon his complaint for the death of his wife, Mary Owens ("Mary"), arising from medical malpractice. We affirm.

### Issues

Dr. Foster raises two issues:

I.     Whether he was entitled to a jury instruction on contributory negligence; and

II.     Whether the trial court abused its discretion by allowing a rebuttal argument that was not supported by the evidence.

### Facts and Procedural History

The facts most favorable to the judgment follow. During March of 1997, Dr. Foster, an internist, began to treat Mary for gallstones and pancreatitis. During April of 1997, Mary underwent gall bladder surgery at Henry County Hospital. The surgeon observed cirrhosis of the liver, and performed a liver biopsy. Henry County Hospital records provided to Dr. Foster indicated that Mary had been diagnosed with cirrhosis of the liver and Hepatitis C. Mary was aged seventy-two, her liver was shrunken, and her blood clotting ability was compromised by liver disease. Nevertheless, Dr. Foster performed a second diagnostic liver biopsy upon Mary at Henry County Hospital on January 28, 1998. During the surgery, an artery in Mary's gallbladder bed was lacerated. Mary began to bleed from the laceration, and the blood pooled in her lungs.

As of January 29th, Mary had lost four to five units of blood, approximately one-third of her blood volume. Her hemoglobin level fell to 8.8 (from a preoperative level of 12.7). On January 30th, Mary received multiple units of blood and her hemoglobin level rose to 9.3. She improved over the next few days, but apparently suffered a re-bleed on February 3rd. On February 4th, after Mary received additional transfusions of blood, her hemoglobin level was 8.8. Mary was also given oxygen.

On February 5th, Dr. Foster advised Mary that she had a fluid build-up in her right lung, which would need to be removed via a thoracentesis. After Dr. Foster left the hospital room, a nurse explained to Mary and Forrest the procedure, which involves placing a needle or tube in between the lungs and draining fluid. On February 6th, Mary was discharged from Henry County Hospital with instructions to return to Dr. Foster's office in one week. Mary was also instructed to call if she experienced "worsening shortness of breath or signs of bleeding." (Tr. 619.)[1]

Mary returned home, but experienced constant pain, shortness of breath, and an inability to keep food down. On February 7th, Mary was admitted to Hancock County Hospital. She had apparently suffered another re-bleed, and her hemoglobin level had dropped to 7.9. Hancock County Hospital requested Mary's medical records from Henry County Hospital. Among the items received from Henry County Hospital was a "History and Physical Examination" composed by Gary Stouder, M.D., disclosing in pertinent part: "[Mary] continued to have bleeding and had some elevation of her protime and was given some blood and sent home for a few days for her

bleeding time to get to normal before a thoracentesis was done since she had a right pleural effusion." (Tr. 644.)

On February 8th, Mary was transferred to Methodist Hospital in Indianapolis. There, Mary had a tubal thoracotomy to drain fluid from her chest. On February 9th, Mary underwent thoracic surgery. It was determined that Mary had "massive blood loss" due to "persistent bleeding from the gallbladder fossa." (Tr. 647, § 8, pg.13.). Her attending physicians opined that she had virtually no hope to recover. On February 23rd, Mary died.

The Marion County Coroner, Dr. John McGoff, and pathologist Dr. Michael Clark conducted an investigation of Mary's death. Dr. McGoff determined that the cause of death was the liver biopsy. According to Dr. McGoff, the liver biopsy led to hypovolemia, which led to multi-system organ failure.

Forrest filed a proposed medical malpractice complaint with the Indiana Department of Insurance, naming as defendants Dr. Foster, Daniel House, M.D., and Henry County Memorial Hospital. A medical review panel was formed and, on November 11, 2003, the panel rendered its unanimous opinion as follows:

> With respect to Richard Foster, M.D., the evidence supports the conclusion that said defendant failed to comply with the appropriate standard of care as charged in the complaint. The panel further finds that said conduct complained of was a factor in the resultant harm.
>
> With respect to all other defendants, the evidence does not support the conclusion that said defendants failed to comply with the appropriate standard of care as charged in the complaint.

---

1. According to Forrest, Mary expected to have the thoracentesis in a few days. According to Dr. Foster, Mary refused the thoracentesis.

(Appellee's App. 107.) On December 22, 2003, Forrest filed his complaint in the Henry County Circuit Court.

The jury trial commenced on June 27, 2005. Before the jury received preliminary instructions, the trial court conducted a hearing as to whether Dr. Foster's allegation that Mary refused thoracentesis would be addressed in an instruction on contributory negligence or in an instruction on mitigation of damages. The trial court ruled as follows: "I'm going to allow Dr. Foster to testify that he recommended a thoracentesis and that, in his opinion, had she had such a procedure, she would not have died. It is mitigation of damages argument, not contributory negligence." (Tr. 15.) Dr. Foster testified accordingly, and the jury was instructed on mitigation of damages.

The jury found in favor of Forrest upon his medical malpractice claim, and awarded him $450,000.00 in damages. Dr. Foster now appeals.

### Discussion and Decision

#### I. Jury Instruction

At the commencement of trial, Dr. Foster tendered a contributory negligence jury instruction, providing in pertinent part as follows:

[T]he defendants have claimed a certain specific defense, and the defendants do have the burden of proving this defense by a preponderance of the evidence. The defendants have claimed that Ms. Owens was contributorily negligent. The defendants have the burden of proving the following propositions by a preponderance of the evidence:

that Ms. Owens was negligent by refusing to undergo a thoracentesis to remove fluid from her lung; and,

that Ms. Owens' negligence contributed to cause her death.

(Appellant's App. 130.) The trial court refused the foregoing instruction, and instead instructed the jury on mitigation of damages, in pertinent part as follows:

[T]he defendant has claimed certain defenses. The Defendant recommended treatment, a thoracentesis, which he alleges the Plaintiff did not follow, and that such failure to follow recommended treatment constitutes a failure to mitigate damages. The defendants have the burden of proving their defenses by a preponderance of the evidence.

(Appellant's App. 215.) Dr. Foster claims he was entitled to a contributory negligence instruction. In reviewing a trial court's decision to give or refuse a tendered instruction, we consider whether the instruction (1) correctly states the law, (2) is supported by the evidence in the record, and (3) is covered in substance by other instructions. *Willis v. Westerfield,* 839 N.E.2d 1179, 1189 (Ind.2006). The trial court has discretion in instructing the jury, and we will reverse upon one of the last two issues only when the instructions amount to an abuse of discretion. *Id.* Here, neither party claims that the trial court misstated the law. Rather, the dispute is whether the evidence of record supported a contributory negligence instruction as opposed to a mitigation of damages instruction.

In general, a medical malpractice plaintiff must prove that: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused the plaintiff's injuries. *Sawlani v. Mills,* 830 N.E.2d 932, 938 (Ind.Ct.App.2005), *trans. denied.* Contributory negligence is conduct on the part of the plaintiff, which contributes as a legal cause to the harm that the plaintiff has suffered, and which falls below the standard to which the plaintiff is required to conform for his or her own protection.

*Faulk v. Northwest Radiologists, P.C.*, 751 N.E.2d 233, 239 (Ind.Ct.App.2001), *trans. denied.*

■■■ Indiana's Comparative Fault Act expressly excludes medical malpractice actions from its scope. Ind.Code § 34–51–2–1(b). As such, a patient's contributory negligence operates as a complete defense to a medical malpractice action. *Faulk,* 751 N.E.2d at 239. However, in order to constitute a bar to recovery, contributory negligence must be a proximate cause of the injury. *Id.* at 242. The contributory negligence must be "simultaneous with the fault of the defendant" and it must also "enter into the creation of the cause of action." *Id.*

■■■ By contrast, mitigation of damages is not an affirmative defense to liability. *Willis,* 839 at 1187. It is rather an affirmative defense that may reduce the amount of damages a plaintiff is entitled to recover after liability has been found. *Id.* The obligation of a plaintiff to mitigate damages generally refers to the expectation that a person who has been injured should act to minimize damages after an injury-producing incident. *Kocher v. Getz,* 824 N.E.2d 671, 674 (Ind.2005). The amount of damages a plaintiff is entitled to recover is reduced by those damages which reasonable care would have prevented. *Willis,* 839 N.E.2d at 1187.

■■■ The defense of failure to mitigate damages has two elements: (1) the defendant must prove that the plaintiff failed to exercise reasonable care to mitigate his or her post-injury damages; and (2) the defendant must prove that the plaintiff's failure to exercise reasonable care caused the plaintiff to suffer an identifiable item of harm not attributable to the defendant's negligent conduct. *Id.* at 1188. It is not enough to establish that the plaintiff acted unreasonably. *Id.* The defendant must establish "resulting identifiable quantifiable additional injury." *Id.*

Here, Forrest presented evidence that Dr. Foster performed an unnecessary surgery upon Mary, a high-risk patient suffering from liver disease, and caused a laceration resulting in massive bleeding into Mary's lungs. The undetected injury caused persistent bleeding until corrective surgery was performed at Methodist Hospital.

In his defense, Dr. Foster testified that he recommended thoracentesis before Mary was discharged from Henry County Hospital, but she refused. He testified that thoracentesis would "have changed [Mary's] course," as the lung collapse and respiratory failure would not have happened. (Tr. 396.) Dr. Foster opined that Mary "wouldn't have died" had he been allowed to "remove the fluid out of her chest" at Henry County Hospital. (Tr. 405.) His expert witness, Dr. David Pound, had served as a member of the Medical Review Panel that opined Dr. Foster failed to comply with the appropriate standard of care. At trial, Dr. Pound clarified that "his opinion was based on care after the biopsy." (Tr. 465.) He opined that thoracentesis would have "helped relieve" Mary's respiratory failure. (Tr. 468.)

■■■ In reliance upon this defense testimony, Dr. Foster claims on appeal that Mary's failure to follow his instructions brought about "the injury complained of, the wrongful death of Mary." Appellant's Br. at 13. He further argues that there was evidence that Mary's negligence was "simultaneous" or "concurrent" with his own, although he does not actually identify any testimony of a particular deficiency in his conduct after the biopsy was conduct-

ed.[2] Dr. Foster refers to an allegation in the complaint and a proposed preliminary jury instruction rather than actual evidence of his post-biopsy negligent conduct.[3] As previously stated, an instruction must have evidentiary support. *Willis*, 839 N.E.2d at 1189. The evidence of record does not indicate "simultaneous" fault creating a cause of action. *See Faulk*, 751 N.E.2d at 242.

The theory of Dr. Foster's case was that Mary would have recovered had she agreed to thoracentesis at Henry County Hospital. Nevertheless, it is apparent that the injury in need of correction—i.e., the liver laceration—was accomplished before Mary was confronted with a decision on thoracentesis. Assuming that she refused a procedure against medical advice and the refusal was detrimental to her, it was a failure to mitigate her (already inflicted) damages.

However, Dr. Foster and Dr. Pound testified in conclusory language, and failed to address the actual causation of injury from Mary's alleged failure to follow medical advice, regardless of whether her conduct is couched in terms of mitigation of damages or contributory negligence. It is undisputed that thoracentesis, or the introduction of a needle or tube into the lung, would have drained fluid but would not have addressed the underlying cause of the bleeding. Until the open chest surgery was performed, the source of the bleeding, the holes in the gallbladder bed, was not revealed. Neither Dr. Foster nor Dr. Pound went beyond a broad statement that Mary would not have died or would have had a better outcome to explain in particular how an earlier thoracentesis would have stopped the bleeding.

In short, not only did Dr. Foster fail to demonstrate his entitlement to an instruction on contributory negligence, he would not have been entitled to an instruction on mitigation of damages, based upon the evidence presented. In other words, Dr. Foster did not show "resulting identifiable, quantifiable, additional injury" from Mary's conduct. *Willis*, 839 N.E.2d at 1188. However, because Forrest's damages were not reduced, the mitigation of damages instruction is harmless.

## II. Rebuttal Argument

■■■ During the rebuttal portion of closing arguments, Forrest's counsel stated to the jury:

I believe when you look, back in the deliberation room, at Exhibit 43, and 44, you're going to find that the records that were presented to you by Dr. Foster are suspect. Exhibit 42, the emergency room surgeon had sent to him records by Henry County Hospital on the 7th, including the discharge note, the history and physical, and he is summarizing that in Exhibit 42, and the information that

---

**2.** Dr. Pound testified, generally, that his Medical Review Panel opinion that Dr. Foster failed to meet the requisite standard of care was based on conduct after the biopsy. However, Dr. Pound did not testify in particular as to how Dr. Foster deviated from a reasonable standard of care after the biopsy was performed.

**3.** In his brief, Dr. Foster states: "His [Forrest's] tendered jury instruction alleged 'Dr. Foster was negligent...in his treatment of complications from the biopsy, and that as a proximate result thereof, Mary Owens suffered wrongful death on February 23, 1998.' " Appellant's Br. at 14. Forrest's proposed preliminary jury instruction actually provides: *"The plaintiff, Forrest Owens, claims that* the defendant, Richard Foster, M.D., was negligent in his treatment of his wife, Mary Owens, in performing a liver biopsy, and in his treatment of complications from the biopsy, and that as a proximate result thereof, Mary Owens suffered wrongful death on February 23, 1998." (Appellant's App. 125.) (emphasis added.)

we got from the Henry County records that were sent to him is as follows. She continued to have bleeding and had some elevation of her pro-time and was given some blood and sent home for a few days for her bleeding time to get to normal because a thoracentesis was, before a thoracentesis was done since she had a right pleural effusion.

Dr. Foster objected on grounds of lack of foundation. The objection was overruled; however, the trial court admonished the jury that argument of counsel is not to be considered evidence. Dr. Foster now argues that the trial court permitted a "last minute ambush [that] was highly prejudicial." Appellant's Br. at 16.

■■■■■ "A trial judge has broad discretion in determining what is improper argument. This Court will reverse a judgment because of improper remarks by counsel only when it appears from the entire record that those remarks were probably the means of securing an incorrect verdict." *Weinstock v. Ott,* 444 N.E.2d 1227, 1241 (Ind.Ct.App.1983). Throughout the trial, Forrest challenged Dr. Foster's credibility. In particular, counsel elicited testimony to highlight discrepancies between Dr. Foster's testimony of a refused thoracentesis and certain documentation provided to Hancock County Hospital describing a delay to "get bleeding time to normal." (Plaintiff's Exhibits 42.) In rebuttal argument, counsel was commenting upon the evidence and suggesting reasonable inferences to be drawn therefrom, as counsel was entitled to do. *See Jackson v. Beard,* 146 Ind.App. 382, 255 N.E.2d 837, 848 (1970). Dr. Foster has not demonstrated that the trial court permitted "an ambush" or otherwise abused its discretion.

## Conclusion

Dr. Foster has shown no reversible error in jury instruction. Furthermore, he has demonstrated no abuse of discretion in the trial court's conduct of closing arguments.

Affirmed.

BAKER, J., and NAJAM, J., concur.