RONDA HALL, Plaintiff-Appellant, v. ION DUMITRU, Defendant-Appellee.

Fifth District   No. 5—92—0096

Opinion filed September 22, 1993.

Ronald A. Roth and R.D. Robinson, both of Bernard & Davidson, of Granite City, for appellant.

Richard M. Roessler and Thomas R. Peters, both of Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, for appellee.

JUSTICE MAAG delivered the opinion of the court:

This case involves a claim of alleged medical malpractice. The plaintiff, Ronda Hall, claimed that the defendant, Dr. Ion Dumitru, performed a tubal ligation that was unsuccessful. Due to the alleged ineffectiveness of the procedure, the plaintiff later became pregnant. She sought damages related to her subsequent pregnancy. The jury rendered a verdict in favor of the defendant, the plaintiff's post-trial

motion was denied, and plaintiff has appealed claiming error in evidentiary rulings made by the court. Because of the nature of the issues raised, we will describe in detail the medical procedures performed.

On April 29, 1987, the plaintiff, Ronda Hall, sought the services of the defendant, Ion Dumitru, M.D., an obstetrician-gynecologist. On that date she complained of pain, menstrual abnormalities, and panic anxiety crises related to petit mal epilepsy. The plaintiff tested positive for pregnancy.

Later, on June 15, 1987, the plaintiff saw the defendant for complaints of vaginal bleeding. On June 18, 1987, testing ordered by the defendant showed that plaintiff had a blighted ovum. Upon the defendant's recommendation, the plaintiff agreed to have a dilation and curettage (D & C) and also authorized the performance of a tubal ligation. She was informed that the procedure would prevent further pregnancies by irreversibly obstructing her fallopian tubes.

The defendant performed the D & C on June 24, 1987, as well as the tubal ligation.

In performing the tubal ligation, plaintiff was placed under general anesthetic, an incision was made in her abdomen below her naval, and a needle was inserted into the abdomen. The defendant then injected carbon dioxide through the needle to inflate the abdomen, thus allowing more working room. This was necessary because when performing a tubal ligation there is a risk of injury to the bowel, aorta, or vena cava. A tube was then inserted, and through the tube a laparoscope was passed into her abdomen. The defendant used a grasper to apply small fallope rings around the plaintiff's fallopian tubes. The defendant placed one ring around plaintiff's right fallopian tube and two rings around her left fallopian tube.

The defendant testified that the plaintiff wanted the tubal ligation done at the same time as the D & C because she was afraid of being put to sleep and if the procedures were done separately she would have to undergo general anesthesia twice. If the two procedures were combined, only one general anesthesia would be required.

The defendant testified that while performing the tubal ligation, he lacerated one of the plaintiff's fallopian tubes. Such a laceration could cause the procedure to be ineffective. Consequently, on July 1, 1987, he offered to do a second tubal ligation free of charge. According to the defendant, the plaintiff refused the offer of a second tubal ligation.

In April 1988 the plaintiff was diagnosed as pregnant. She delivered her child in December of 1988 and gave the child up for adoption

due to her economic circumstances. Dr. Sun, plaintiff's subsequent obstetrician-gynecologist, advised her after the birth to have another tubal ligation performed because of the heightened risk of an ectopic or tubal pregnancy related to the failure of the original tubal ligation. This recommendation was based upon the fact that ectopic or tubal pregnancies can be life threatening. The plaintiff signed consent forms to have the second ligation surgery performed in January 1989 then rescheduled it for March of 1990. She failed or refused to go forward with the second ligation surgery.

In contrast to defendant's testimony, the plaintiff testified that the defendant never advised her at any time that he had lacerated her fallopian tube during the June 24, 1987, tubal ligation. She denied that he had offered her a second ligation surgery free of charge. She further testified that she declined to have the procedure performed again as recommended by Dr. Sun, because she feared a second surgery also would be a failure.

In early 1991 after this action had been filed, the plaintiff developed a potentially life-threatening ectopic or tubal pregnancy which required surgery and a three-day hospital stay. At trial she claimed damages for pain and suffering due to the unwanted 1988 pregnancy and for the March 1991 ectopic pregnancy and resulting surgery.

Prior to trial, plaintiff filed a motion *in limine* seeking an order barring argument or testimony "[t]hat [plaintiff] could have, or should have, mitigated her damages by electing another tubal ligation procedure subsequent to the determination that she had become pregnant after the June 24, 1987 tubal ligation." The trial court denied plaintiff's motion *in limine*, relying on the fact that plaintiff did not exhibit or manifest any fear of the tubal ligation procedure and that she did not express any fear to Dr. Sun. The trial court indicated that it would allow evidence regarding the medical advice given plaintiff and plaintiff's reasons for not having another tubal ligation surgery. The record indicates that the trial court wanted the jury to decide whether it was reasonable for plaintiff not to follow the medical advice given to her by Dr. Sun and allegedly by defendant to have a second ligation surgery.

During the trial, the jury heard evidence of the plaintiff's failure or refusal to undergo a second ligation surgery on four occasions: first, during the cross-examination of Dr. Sun; second, during the cross-examination of the plaintiff; third, during the direct examination of defendant; and finally, from defendant's expert. The defendant's counsel argued to the jury that the plaintiff's failure or refusal to un-

dergo the second surgery was an unreasonable failure to mitigate her damages.

On November 21, 1991, the jury, after nine hours of deliberations, returned a verdict in favor of the defendant and against the plaintiff. The sole issue raised on appeal is whether the trial court's admission of evidence and argument that plaintiff could have mitigated her damages by undergoing surgery was erroneous and prejudicial to plaintiff warranting a new trial.

The jury received Illinois Pattern Jury Instructions, Civil, No. 105.08 (3d ed. 1992), which provides:

> "A patient must exercise ordinary care to seek treatment and follow reasonable medical advice. A physician is not liable for the consequences of a patient's failure to do so. A patient's failure to use ordinary care in obtaining treatment or in following instructions does not absolve the physician from any damages resulting from the physician's negligence. It only absolves the physician from any damages caused by the patient's failure to exercise ordinary care to seek treatment and follow reasonable medical advice." Illinois Pattern Jury Instructions, Civil, No. 105.08 (3d ed. 1992) (hereinafter IPI Civil 3d).

The committee notes to IPI Civil 3d No. 105.08 refer to IPI Civil 3d No. 33.01. (IPI Civil 3d No. 105.08, Comment, at 150—20.) That instruction states:

> "In fixing the amount of money which will reasonably and fairly compensate the plaintiff, you are to consider that an injured person must exercise ordinary care to obtain medical treatment. Damages proximately caused by a failure to exercise such care cannot be recovered." IPI Civil 3d No. 33.01.

The committee comments to IPI Civil 3d No. 33.01 state: "No instruction should be given with reference to the plaintiff's duty to submit to *major* surgical operations. Whether the plaintiff is to undergo a serious operation is a matter for him to decide." (Emphasis added.) (IPI Civil 3d No. 33.01, Comment, at 33—3.) Relying upon this comment and *Rosenstein v. Chicago Transit Authority* (1973), 12 Ill. App. 3d 1089, 299 N.E.2d 396, this court has previously held that "[i]t is clear that an injured person has no duty to undergo surgery to mitigate his damages." *Montgomery v. Terminal R.R. Association* (1979), 73 Ill. App. 3d 650, 655, 392 N.E.2d 77, 81.

In *Montgomery*, the plaintiff suffered a back injury when the train engine he occupied was struck by a runaway boxcar. The trial court heard the plaintiff's *in camera* testimony that surgery had been recommended to improve his condition and that the plaintiff rejected

surgery on religious grounds. We affirmed the trial court's refusal to admit evidence regarding the surgery or Montgomery's reasons for refusing it, specifically holding that an injured person has no duty to undergo surgery to mitigate damages.

In the case before us, the trial court relied upon *Corlett v. Caserta* (1990), 204 Ill. App. 3d 403, 562 N.E.2d 257, and declined to follow our holding in *Montgomery*. Defendant argues that *Corlett* is controlling. We disagree.

The court in *Corlett* outlined various factors to be weighed, which included "the gravity of plaintiff's original [condition], the intrusiveness of the proposed medical procedure and its attendant risk of complications, the feasibility of alternate medical procedures, the expense of the proposed medical treatment, the likelihood of increased recovery if the proposed medical procedure had been accepted by the plaintiff, and other relevant circumstances." *Corlett*, 204 Ill. App. 3d at 414, 562 N.E.2d at 263.

*Corlett* is distinguishable from *Montgomery* and the instant case. *Corlett* did not involve the issue of plaintiff's duty to undergo surgery to mitigate damages. Rather, the central issue in *Corlett* concerned that plaintiff's refusal to receive a blood transfusion on religious grounds.

In *Corlett*, the court analyzed the duty to submit to reasonable medical treatment in terms of mitigation of damages and comparative fault and from the standpoint of assumption of the risk. The court then concluded, "[W]hen a physician's negligent acts causes [*sic*] a patient to suffer life-threatening injuries, and the patient exercises his fundamental and religious right to refuse a reasonable lifesaving medical procedure and subsequently dies, the patient's estate must bear a proportionate share of tort liability for the patient's wrongful death, to the extent that the patient's death was proximately caused by the patient's refusal of the reasonable lifesaving treatment." (*Corlett*, 204 Ill. App. 3d at 413, 562 N.E.2d at 263.) The duty of the patient under a *Corlett* analysis is to submit to reasonable medical treatment. A failure to submit will not relieve the tortfeasor of liability but will diminish the damages recoverable by the plaintiff to the extent that submitting to treatment would have reduced the injury. This, however, is only a general rule.

An exception to this general rule, which is recognized in *Corlett*, is that, while a patient has a duty to accept reasonable medical treatment, there is no duty to undergo surgery to mitigate the damages caused by a tortfeasor's negligence. This exception is recognized in the committee comments to IPI Civil 3d No. 33.01 and by most

courts (see, *e.g., Montgomery,* 73 Ill. App. 3d 650, 392 N.E.2d 77) which have considered the issue. This exception has been overlooked on occasion. See *Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266 (affirming the trial court's instruction (IPI Civil 3d No. 33.01) on failure to mitigate due to plaintiff's refusal of a mylegram and laminectomy without mention of *Montgomery* or the committee comments to that instruction).

■ Properly stated, we believe that the rule regarding mitigation of damages in relation to suggested medical treatment is as follows: A patient has a duty to submit to reasonable medical care and treatment intended to improve the patient's condition and reduce or eliminate the consequences of the defendant's tortious act. This duty exists in both the area of medical malpractice as well as in the area of injuries caused in a nonmedical malpractice setting. An exception to this general rule exists with respect to surgical procedures as well as nonsurgical procedures which present a risk of enhanced or additional injury. We believe that use of the term *major* surgery or *serious* surgery to describe the exception leads only to confusion and debate. These undefined terms must be analyzed in light of the interest being protected: that is, the right to forego potentially injurious procedures. A more useful approach, and we believe the correct one, is to ask whether a recognized risk is associated with the proposed treatment. The risk may or may not be common. But, nevertheless, if the proposed treatment could result in an aggravation of the existing condition or the development of an additional condition of ill health, or if the prospect for improved health is slight, then there should be no *duty* to undergo the treatment. If the risk is clearly remote, the exception should not apply. But the risk need not be significant or even probable in order to trigger the exception.

Once the grounds for the exception are established, it should be unnecessary for the patient to articulate the particular reason for choosing to forego the treatment since this is an *objective* test not a *subjective* one. It is not the place of the court or the jury to evaluate a patient's reasons for declining surgery or treatment, if the risks are recognized.

As is the case with many evidentiary rulings a court must make, this analysis involves a mixed question of law and fact. However, since in the final analysis it is a "duty" question, the resolution of the issue is for the court as a question of law.

If the court determines that the exception applies, then no evidence or argument should be allowed regarding the fact that the patient declined the proposed treatment, because in such a case there

would be no *duty* to undergo the treatment. Naturally, under such circumstances there should be no argument or instruction on the failure to mitigate damages with respect to the treatment that was refused.

The trial court in the instant case found that a tubal ligation is a minor surgery. We disagree. The record indicates that the procedure is performed under a general anesthetic, which alone has attendant risks which can be potentially harmful and life threatening. The procedure itself involves the use of a sharp instrument in close proximity to vital organs necessitating the use of carbon dioxide to inflate the abdomen. It is apparent from the record that a tubal ligation surgery involves risks to a woman's life or member. (*Florczak v. Industrial Comm'n* (1942), 381 Ill. 120, 44 N.E.2d 836.) Therefore, the plaintiff was under no duty to undergo the surgery to mitigate her damages, and the evidence on this issue was improperly admitted, and the argument was improperly allowed.

Lastly, defendant argues that because plaintiff's allegations of error are directed to damages, the jury's verdict on liability is not affected. Although it is true that errors concerning the extent of damages are generally not a basis for reversal where the jury finds the defendant not liable, in *Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 599-600, 294 N.E.2d 689, 694, our supreme court recognized "there may be cases in which errors which go to the question of damages may be so pervasive and prejudicial as to create the likelihood that they may have affected a jury's decision on the issue of liability."

■ Such is the case before us. Plaintiff argues that the admission of evidence of the medical recommendation that plaintiff undergo another tubal ligation shifted the jury's attention away from the separate question of defendant's liability. Because of the emphasis on the proposed second ligation surgery, the jury might easily have begun to perceive plaintiff as the wrongdoer. Defendant argues that the admission of evidence of the medical recommendations made to plaintiff could not have confused the jury. We disagree. It would not be unreasonable or surprising that a juror would take the duty improperly imposed on plaintiff to suffer the second ligation surgery and relate it directly to causation and fault. It would not be unreasonable for a jury to believe that but for plaintiff's failure to have the second ligation surgery performed plaintiff would not have experienced the unwanted 1988 pregnancy or the ectopic pregnancy of 1990, thereby completely shifting the jury's attention away from the defendant's alleged malpractice. We believe that this error with respect to damages

was so pervasive and prejudicial as to have affected the jury's decision on liability.

For the foregoing reasons, the judgment of the circuit court is reversed, and the cause is remanded.

Reversed and remanded.

CHAPMAN, P.J., and GOLDENHERSH, J., concur.