**Elwood SIMMONS and Lila Simmons, Appellants–Plaintiffs,**

v.

**ERIE INSURANCE EXCHANGE, Appellee–Defendant.**

No. 32A04–0710–CV–552.

Court of Appeals of Indiana.

Aug. 11, 2008.

Michael E. Simmons, Hume Smith Geddes Green & Simmons, LLP, Indianapolis, IN, Attorney for Appellants.

Robert A. Smith, Peter G. Wenzl, Smith & Wade, LLP, Carmel, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

*Case Summary and Issues*

Elwood and Lila Simmons appeal following a judgment awarding them each

$10,000 following an automobile accident. The Simmonses raise two issues, but we find dispositive the issue of whether the trial court abused its discretion by instructing the jury on the affirmative defense of failure to mitigate damages.[1] Concluding that insufficient evidence exists to support this instruction, we reverse and remand for a new trial.

### Facts and Procedural History

On April 28, 2001, Elwood was involved in an automobile accident with a second vehicle driven by Billie Jo Wilcox. Neither party disputes that Wilcox was 100 percent at fault for this accident. Wilcox had insurance with a bodily injury coverage limit of $50,000, and Wilcox's insurer paid this full amount to Elwood. At the time of the accident, the Simmonses held an automobile insurance policy with Erie. This policy included underinsured motorist bodily injury protection.

Shortly after the accident, Elwood sought treatment from Dr. David Gurvis, who diagnosed Elwood with plantar fasciitis, an ailment causing Elwood pain in his right foot. Dr. Gurvis treated Elwood with anti-inflammatory medicine, foot orthotics, and finally cortisteroid injections. These injections temporarily relieved Elwood's pain, but did not provide permanent relief. Dr. Gurvis administered the second and final injection on December 12, 2001.

At some point, Elwood began walking with his right foot turned out in order to avoid putting pressure on the sore parts of his foot. The doctors who testified in this case referred to this walking style as a "learned gait."

In January 2002 Elwood sought treatment from Dr. Karl Raynor. Dr. Raynor treated Elwood with oral prednisone, a cast, and a walking boot. Elwood testified that after he was in a cast for four to six weeks, his foot "got better." Transcript at 129. In September 2002, Elwood saw Dr. Michael Kramer in relation to hip pain. Dr. Kramer prescribed physical therapy. Elwood did not see Dr. Kramer again until June 2004, when he reported "knee popping" in his right knee. Dr. Kramer examined him and determined that the knee condition was not related to Elwood's gait.

In July 2002, Dr. Raynor referred Elwood to Dr. Theodore Nukes, a neurologist. Dr. Nukes diagnosed Elwood with peripheral neuropathy, which causes, among other things, numbness or tingling in the legs and feet. Dr. Nukes indicated that the pain from Elwood's plantar fasciitis was unrelated to his symptoms from his peripheral neuropathy, as "they're two very separate conditions with separate pathologies." Tr. at 351. Elwood saw another neurologist, Dr. James Cook, who also diagnosed Elwood with peripheral neuropathy. Neither doctor had any reason to believe that Elwood's neuropathy was connected to the accident.

Elwood testified that as a result of his injury, he was required to close the business in which he was a fifty-percent owner because he couldn't "carry [his] load." *Id.* at 138. He also testified that prior to his injury he had been extensively involved in the raising, training, and showing of dogs, but that he was unable to do so now. The Simmonses both testified that they began caring for a relative's two children in 2000. These children have special needs and require continuous care and attention. El-

---

1. The Simmonses also argue that the trial court abused its discretion in denying their motion for a continuance prior to trial. As our resolution of the jury instruction issue requires that we remand for a new trial, we need not address the trial court's refusal to grant a continuance.

wood and Lila both testified that Elwood is now less able to care for the children.

On March 23, 2004, the Simmonses filed their complaint seeking underinsured motorist insurance benefits from Erie. Elwood sought compensation for damages suffered as a result of his injuries and Lila sought damages for loss of services and consortium.

Before trial, in 2006, Elwood returned to Dr. Gurvis so that Dr. Gurvis could "evaluate [Elwood] for [Dr. Gurvis's] deposition." *Id.* at 181. Elwood reported that he had undergone various treatment plans with other physicians and "has had enough." *Id.* at 181. Dr. Gurvis stated that Elwood was "[f]rustrated with being in pain for that long and apparently he's seen other doctors. Nothing has helped so he figures he's just going to have to live with it." *Id.* Dr. Gurvis testified that surgery or shock therapy could provide Elwood relief, but did not state that he informed Elwood of these treatment options.

On June 7, 2004, a jury trial was scheduled for February 23, 2005. Over the next two years, the trial was continued nine times; three times on Erie's motion, three times on the Simmonses' motion, one time by joint motion, and two times on the court's own initiative. The last motion to continue set the trial for August 29, 2007. On August 8, 2007, the Simmonses' counsel received a report from Dr. Thomas Ambrose, whom Elwood consulted on June 11, 2007. Dr. Ambrose's report indicated that Elwood may need a partial or complete knee replacement, but that further testing was required to determine the course of treatment. On August 9, 2007, the Simmonses gave this report to Erie, and inquired whether the parties should attempt to depose Dr. Ambrose or continue the trial. On August 10 Erie responded with a motion to bar expert testimony. The trial court granted this motion on August 13.

On August 16, the Simmonses filed a motion to continue. On August 17, the trial court denied this motion, stating: "The Court denies the Plaintiff's Motion for Continuance as this case has been continued nine (9) times." Appellant's Appendix at 151. The trial court subsequently denied the Simmonses' motion to reconsider and oral request for a continuance on the day of trial.

On the second day of trial, Erie tendered a proposed instruction on the affirmative defense of failure to mitigate damages. Erie had not raised this defense in the pleadings or included an instruction on the affirmative defense in its tendered preliminary instructions. The Simmonses objected, but the trial court ultimately read the following instruction to the jury:

The plaintiff must use reasonable care to minimize his damages. This is called mitigation of damages.

If you find the plaintiff failed to use reasonable care to minimize any of the damages he alleges he sustained and that failure was the proximate cause of any of the damages he claims, then such conduct would reduce the amount of damages that the plaintiff would otherwise recover.

The defendant has the burden of proving by a preponderance of the evidence that the plaintiff failed to use reasonable care to minimize his damages.

Tr. at 404–05. The jury returned a verdict awarding $10,000 each to Elwood and Lila, and the trial court reduced these verdicts to judgments. On September 13, 2007, Erie filed a Request for Nunc Pro Tunc Entry, requesting that Erie be permitted to set off the $50,000 previously received by the Simmonses from Wilcox's insurance company. The trial court granted this motion and issued an order stating that the Simmonses were not entitled to any pay-

ment from Erie. The Simmonses now appeal.

*Discussion and Decision*[2]

## I. Standard of Review[3]

When we review a trial court's decision to give or refuse a tendered instruction, we consider whether: "1) the instruction correctly states the law; 2) the evidence in the record supports giving the instruction, and 3) the substance of the instruction is covered by other instructions." *Hoosier Ins. Co. v. N.S. Trucking Supplies, Inc.*, 684 N.E.2d 1164, 1173 (Ind. Ct.App.1997). In determining whether sufficient evidence exists to support an instruction, we will "look only to that evidence most favorable to the appellee and any reasonable inferences to be drawn therefrom." *Antcliff v. Datzman*, 436 N.E.2d 114, 122 (Ind.Ct.App.1982). We review a trial court's decision to give or refuse to give an instruction for an abuse of discretion.[4] *See Griffin v. Acker*, 659 N.E.2d 659, 662 (Ind.Ct.App.1995), *trans. denied.*

## II. Failure to Mitigate Damages

"The principle of mitigation of damages addresses conduct by an injured party that aggravates or increase the party's injuries." *Willis v. Westerfield*, 839 N.E.2d 1179, 1187 (Ind.2006) (quoting *Deible v. Poole*, 691 N.E.2d 1313, 1315 (Ind.Ct. App.1998), *aff'd* 702 N.E.2d 1076 (Ind. 1998)). The failure to mitigate damages "is an affirmative defense that may reduce the amount of damages a plaintiff is entitled to recover after liability has been found." *Id.* That is, "the amount of damages a plaintiff is entitled to recover is reduced by those damages which reasonable care would have prevented." *Id.* This affirmative defense has two elements, both of which the defendant bears the burden of proving. *Id.* at 1188. "First, the defendant must prove that the plaintiff failed to exercise reasonable care to mitigate his or her post-injury damage. Second, the defendant must prove that the plaintiff's failure to exercise reasonable care caused the plaintiff to suffer an identifiable item of harm not attributable to the defendant's negligent conduct." *Id.* In the context of a claim that the plaintiff failed to follow medical advice, "in order to establish a failure to mitigate, the defendant must also prove that the plaintiff's actions caused the plaintiff to suffer a discrete, identifiable harm arising from that failure, and not arising from the defen-

2. In its appellate brief, Erie makes numerous references to the record without citation. *See* Appellee's Br. at 11, 13, 14, 15, 16, 17, 18, 21, 25. We admonish Erie's counsel to support its factual statements with citation to the record. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n. 5 (7th Cir.2008) (recognizing that a party's failure to adequately cite to the record renders a court's task "unnecessarily burdensome"); *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 664 n. 2 (7th Cir.2005) ("It is the parties' duty to package, present, and support their arguments, and we shall not waste our time searching in vain for a dispute of material fact if we come across a factual contention of denial not adequately supported in the record by citation to admissible evidence.").

3. The Simmonses also argue the trial court abused its discretion in giving this instruction because Erie waived the affirmative defense by failing to plead it or otherwise give notice that it was raising the defense until it tendered its jury instruction on the second day of trial. Because we conclude insufficient evidence supports the instruction, we need not address this issue.

4. If a party argues that a jury instruction incorrectly states the law, our review is de novo. *See Schumm v. State*, 866 N.E.2d 781, 791 (Ind.Ct.App.2007), *modified on other grounds on reh'g*, 868 N.E.2d 1202. The Simmonses do not argue that the trial court's instruction misstates the law.

dant's acts alone." *Id.* Although expert medical testimony is generally required to establish a failure to mitigate damages in this context, there is no bright line rule. *Id.* "A party presenting a failure to mitigate damages defense without expert testimony on causation will do so at his or her own peril." *Id.*

██ Erie argues that Elwood failed to mitigate damages due to his failure to undergo surgery to treat his plantar fasciitis, his learned gait, and his alleged failure to regularly use his medications and orthotics. We will address each in turn.[5]

### A. Surgery

The duty of one injured because of another's fault to submit to invasive treatment has caused courts some trouble.

> Since all surgery involves a more or less violent assault on the organism, it seems, superficially at least, somewhat incongruous to say to one who has been injured by another's fault that he must suffer an additional invasion of his physical integrity in order to protect the wrongdoer from the full consequences of the wrong. On the other hand, it seems unfair and socially undesirable to permit, or even encourage, the tort victim to voluntarily extend or aggravate his pain or disability, and so enhance his damages, when surgery could readily correct the situation.

62 A.L.R.3d 9 § 2(a), 1975 WL 37102.

Indiana courts have not had the opportunity to address a plaintiff's duty to submit to surgery in almost a century. In *Suelzer v. Carpenter*, 183 Ind. 23, 107 N.E. 467, 470 (1915), our supreme court recognized that "[i]t is undoubtedly true that one suffering a bodily injury by reason of another's negligence must use ordinary diligence and care in securing surgical aid, and, failing in such duty, cannot recover for ailments or diseases caused by such neglect." *See also Louisville, N.A., etc., R. Co. v. Falvey*, 104 Ind. 409, 3 N.E. 389, 398 (1885) (same), *reh'g denied*, 104 Ind. 409, 4 N.E. 908 (Ind.1886). Shortly thereafter, our supreme court quoted with approval the following passage:

> The law lays down no hard and fast rule as to the duty of the plaintiff under such circumstances. Whether an operation for his ailment, which might endanger his life in any degree, must be submitted to, is a question which the law cannot answer, nor does it lie in the mouth of a jury to say that the plaintiff should or should not do any particular thing. They are concerned simply with the affairs presented to them at the trial, and whether the damages then appearing to exist are the natural and probable result of the injuries diminished by the efforts for a cure which a reasonably prudent man would have made.

*Haskell & Barker Car Co. v. Trzop*, 190 Ind. 35, 128 N.E. 401, 405 (1920) (quoting *Blate v. Third Ave. R. Co.*, 44 A.D. 163, 60 N.Y.S. 732, 735 (1899)).

---

**5.** We note that Erie notes Elwood's refusal to undergo a spinal tap. However, this spinal tap was recommended in relation to treatment for Elwood's peripheral neuropathy. The Simmonses specifically indicated that they were not seeking damages for anything related to peripheral neuropathy. Indeed, one of the central themes at trial was discussion over whether certain ailments were symptoms caused by plantar fasciitis (therefore caused by the accident) or symptoms of peripheral neuropathy (therefore not a result of the accident). Therefore, even if Elwood's refusal to undergo a spinal tap could have constituted a failure to mitigate damages caused by his peripheral neuropathy, as the Simmonses did not claim damages based on his peripheral neuropathy, this refusal could not constitute evidence supporting an instruction on failure to mitigate damages caused by the accident.

These principles seem consistent with the prevailing view regarding an injured plaintiff's duty to submit to surgery: "there can be no recovery for elements of damages which would have been avoided by surgery to which an ordinarily reasonable man, under all the circumstances, would have submitted." 62 A.L.R.3d 9 § 2(a), 1975 WL 37102 (1975). Circumstances relevant to whether a reasonable man would have submitted to surgery include the predicted degree of success, the threat of harm caused by the surgery, the pain involved in the operation, and the surgery's expense and inconvenience. *See id.; Zimmerman v. Ausland*, 266 Or. 427, 513 P.2d 1167, 1170 (1973) ("The factors to be considered for this purpose ordinarily include the risk involved (i.e., the hazardous nature of the operation), the probability of success, and the expenditure of money or effort required. Some courts also consider the pain involved as a factor."). Based on this general principle, many jurisdictions have established rules as to when surgery is or is not required. *See McDonnell v. McPartlin*, 303 Ill.App.3d 391, 236 Ill.Dec. 826, 708 N.E.2d 412, 420 (1999) ("Illinois law is clear; a plaintiff has no duty to mitigate his damages by submitting to serious or major surgery."), *aff'd*, 192 Ill.2d 505, 249 Ill.Dec. 636, 736

N.E.2d 1074 (2000) [6]; *Lawrence v. City of Shreveport*, 948 So.2d 1179, 1188 (La.Ct. App.2007) ("Personal injury plaintiffs must minimize their damages by submitting to reasonable corrective surgery necessary to eliminate any permanent disability."), *writ denied; Seagers v. Pailet*, 656 So.2d 700, 714 (La.Ct.App.1995) ("Failure to undergo corrective surgery because the plaintiff cannot monetarily afford to do so is not failure to mitigate damages."); *Favier by Favier v. Winick*, 151 Misc.2d 910, 583 N.Y.S.2d 907, 908 (1992) ("[T]he law does not require a plaintiff ... to submit to a surgical operation which may be dangerous to life, even though it may possibly result in a cure of his physical condition, in order to reduce the defendant's damages."); *Harris v. Equitable Life Assur. Soc. of U.S.*, 572 P.2d 593, 595 (Okl.App. 1977) ("It is clearly the law in Oklahoma in the area of tort litigation ... that an injured party is not required to undergo major surgery to recover benefits."); *Lobermeier v. Gen. Telephone Co. of Wisc.*, 119 Wis.2d 129, 349 N.W.2d 466, 476 (1984) (recognizing that an injured plaintiff is obligated "to submit and undergo recommended surgical treatment ... which is not hazardous and is reasonably within his means"), *reconsideration denied*, 120 Wis.2d 419, 355 N.W.2d 531 (1984).

**6.** One decision of the Illinois court of appeals has held that "while a patient has a duty to accept reasonable medical treatment, there is no duty to undergo surgery to mitigate the damages caused by a tortfeasor's negligence." *Hall v. Dumitru*, 250 Ill.App.3d 759, 189 Ill. Dec. 700, 620 N.E.2d 668, 672–73 (1993), *appeal denied.* The court recognized that Illinois courts had not universally followed this rule, but opted for a bright-line rule, believing "that use of the term major surgery or serious surgery to describe the exception leads only to confusion and debate." *Id.* at 673. However, *McDonnell* cited *Hall* for the rule that "a plaintiff has no duty to mitigate his damages by submitting to *serious or major* surgery." 303 Ill.App.3d 391, 236 Ill.Dec. 826, 708

N.E.2d at 420 (Emphasis added). The decision of the Illinois supreme court affirming *McDonnell* also cited *Hall* adding the "serious or major" language. *McDonnell*, 192 Ill.2d 505, 249 Ill.Dec. 636, 736 N.E.2d at 1089. In *Williams v. Manchester*, 372 Ill.App.3d 211, 309 Ill.Dec. 722, 864 N.E.2d 963, 987 (2007), *vacated in part*, 228 Ill.2d 404, 320 Ill.Dec. 784, 888 N.E.2d 1 (2008), the court discussed *Hall* and quoted with approval passages explaining the court's decision to opt for the bright line rule. The Illinois supreme court vacated this portion of the appellate court's decision, although the supreme court did not discuss the appellate court's use of *Hall* or find it necessary to discuss the issue of mitigation of damages.

▆▆▆▆ Based on the small amount of Indiana caselaw regarding this issue, the rules generally accepted by our sister states, and Indiana caselaw on a plaintiff's duty to mitigate damages involving personal injury in general, we conclude that whether a plaintiff has a duty to submit to surgery requires a "reasonable person" analysis. Although the question of whether a reasonable person, under all the circumstances, would submit to surgery will normally be a question for the jury, *see* 62 A.L.R.3d 9 § 2(a) ("[T]ypically the issue of the reasonableness of plaintiff's choice [to decline to undergo surgery] has been held for the trier of fact" (citing *Thompson v. Quarles*, 297 S.W.2d 321 (Tex.Civ.App. 1956), *writ refused*)), under some circumstances, courts will be able to answer the question as a matter of law, *cf. Lasley v. Moss*, 500 F.3d 586, 590 (7th Cir.2007) (concluding that the plaintiff's decision regarding treatment was reasonable and granting the plaintiff's motion for judgment as a matter of law on the defendant doctor's defense of failure to mitigate damages); *Wal–Mart Stores, Inc. v. Blaylock*, 591 N.E.2d 624, 627 (Ind.Ct.App.1992) ("We fail to see how this evidence [that the plaintiff ceased taking medication while he had the flu, as the medicine might have caused or aggravated his headaches or nausea], viewed in any light, could constitute an unreasonable failure to mitigate the damages."), *trans. denied.* We also agree that the factors that should normally be considered when making a reasonable person inquiry are those identified by our sister states: 1) the likelihood that the surgery will correct or improve the condition; 2) the risk involved in the surgery; 3) the pain or inconvenience caused by the surgery; and 4) the ability of the plaintiff to bear the cost of the surgery. In accordance with our supreme court's decision in *Willis*, we note that although expert medical opinion will normally be necessary as to the first three factors, no bright-line rule exists on this point. *See Willis*, 839 N.E.2d at 1189; *cf.* 62 A.L.R.3d 9 § 2(a) (stating that a surgery's risks and chances for success "are obviously questions upon which medical testimony will be controlling").

▆▆▆▆ Initially, we note that no evidence indicates that any doctor ever advised Elwood to submit to surgery. Dr. Gurvis testified that when he saw Elwood in 2006, he did not "prescribe any care or treatment." Tr. at 180. Dr. Gurvis testified that Elwood seemed "[f]rustrated with being in pain for that long," and told Dr. Gurvis "he has had enough ... [b]efore [Dr. Gurvis] could even offer treatment." *Id.* at 181. Further, it appears that the purpose of Elwood seeing Dr. Gurvis at this appointment was "so that [Dr. Gurvis] would be aware of what his condition was for this deposition," and that Elwood was not there "for care or treatment." *Id.* Thus, it appears that not only did Dr. Gurvis not recommend surgery at this appointment, Elwood does not appear to have been at this appointment for further treatment. Indeed, he had not seen Dr. Gurvis in over three years. Elwood had a duty to seek medical advice regarding his injury, and he did seek such advice from several doctors. However, he did not have a duty to undergo surgery that was never prescribed, or even recommended. Not only did Dr. Gurvis not prescribe surgery, he was not even Elwood's treating physician at the time of the 2006 meeting. *Cf. Lake v. Gautreaux*, 893 So.2d 252, 257 (Miss.Ct.App.2004) (recognizing that a doctor's statement did not indicate that the plaintiff had been prescribed certain treatment; the doctor's testimony was "simply his factual findings and statements regarding what his recommendations would be if he was employed as [the plaintiff's] treating physician").

Not only did Elwood never explicitly receive medical advice that he undergo surgery, only one doctor even mentioned surgery as an advisable remedy for his condition, and this doctor did not even explicitly state that surgery was the preferred next step in Elwood's treatment. *Cf. Automatic Merchandisers, Inc. v. Ward,* 98 Nev. 282, 646 P.2d 553 (1982) (concluding trial court properly declined to give instruction on failure to mitigate damages where "surgery was not even consistently recommended prior to trial," the plaintiff "sought and received competent medical, albeit non-surgical, treatment," and "surgery was recommended only as an elective procedure").

Further, little evidence exists in the record regarding the surgery described by Dr. Gurvis. Dr. Gurvis did testify that surgery's success rate "runs between ninety and ninety-five percent." Tr. at 193. Dr. Gurvis also testified that this procedure "has all the risks attendant to surgery." *Id.* However, no testimony or other evidence exists as to what risks these might be. Although we might surmise that the risks involved in this foot surgery are less serious than other types of surgery, it is not this court's province to supplement the record with our speculations or personal knowledge. Instead, we must take the record as presented. In its present state, the record tells us nothing (and in turn told the jury nothing) about the risks involved in the surgery described by Dr. Gurvis. Without this information, we fail to see how a trier of fact could properly determine whether a decision to decline such a surgery was reasonable.

■ Also lacking from the record is any evidence regarding the cost,[7] pain, or inconvenience associated with the surgery. Although we find no need to adopt a rule relating to the cost or inconvenience caused by surgery, we note that this information is clearly relevant to a determination of the reasonableness of a decision to forego surgery. *See Dubroc v. Swain,* 833 So.2d 538, 540 (La.Ct.App.2002) (concluding that the plaintiff did not fail to mitigate damages by waiting three days to see a doctor "because it was Christmas and she did not want to spend the holidays in a hospital emergency room," or by ceasing massage therapy for five months because the costs were prohibitive); *Lake,* 893 So.2d at 256 ("[W]here funds are necessary to meet the situation and the injured person is without the funds [for medical treatment], he is excused from the effort." (quoting *Tri–State Transit Co. v. Martin,* 181 Miss. 388, 396, 179 So. 349, 350 (1938))); *cf. Bank One, Texas, N.A. v. Taylor,* 970 F.2d 16, 29 (5th Cir.1992) ("Although an injured party is required to use reasonable diligence to minimize his losses, he is not required to 'make unreasonable personal outlays of money.'" (quoting *Halliburton Oil Well Cementing Co. v. Millican,* 171 F.2d 426, 430 (5th Cir.1948))), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993); *R.E.T. Corp. v. Frank Paxton Co., Inc.,* 329 N.W.2d 416, 422 (Iowa 1983) ("[A] lack of sufficient

---

7. We note that had Elwood elected to undergo surgery, and it was determined that such a decision was reasonably necessary, he would have been entitled to recover from Erie the costs of the surgery. *See Sheffet v. County of Los Angeles,* 3 Cal.App.3d 720, 84 Cal.Rptr. 11, 17 (1970) ("[A] person who reasonably acts to minimize the damage should recover the costs of such 'minimization' as damages."); *State v. Signo Trading Intern., Inc.,* 130 N.J. 51, 612 A.2d 932, 938 (1992) ("There is no novelty to the proposition that in a conventional tort action, once some present injury has been proved, the plaintiff's damages may include the cost of measures intended to prevent future injury." (quoting *Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.,* 231 N.J.Super. 1, 554 A.2d 1342, 1348 (1989))).

funds will excuse an absence of effort to lessen damages." (quoting 22 Am.Jur.2d, Damages, § 32 at 55 (1965))); *Fukida v. Hon/Hawaii Service & Repair*, 97 Hawai'i 47, 33 P.3d 543, 548 (Ct.App.2001) (concluding the defendant failed to establish that the plaintiff failed to mitigate damages by executing a bond to acquire possession of his car, where the defendant failed to introduce evidence of the bond's cost), *aff'd in relevant part*, 97 Hawai'i 38, 33 P.3d 204, 208 n. 8 (2001).

Based on the circumstances at bar—1) no doctor recommended surgery to Elwood; 2) Elwood saw several doctors, who prescribed a variety of treatments other than surgery; and 3) Erie's failure to introduce evidence regarding the risks, benefits, costs, or inconveniences of the surgery—we conclude Elwood's failure to undergo surgery is insufficient to support an instruction on failure to mitigate damages.

### B. Elwood's Gait

■■■ Erie also argues that the instruction on failure to mitigate damages was supported by evidence relating to Elwood's "learned gait." Although Erie attempts to paint Elwood's gait as some sort of voluntary choice, it is clear that Elwood has developed this gait as a direct result of his plantar fasciitis. *See* Tr. 183 (Dr. Gurvis agreeing that patients with plantar fasciitis commonly develop learned gaits); *id.* at 199 (Dr. Gurvis testifying "that [Elwood] has altered his gait pattern even more in a learned fashion to try to avoid walking on the painful area of the heel"); *id.* at 200 (Dr. Gurvis testifying "What's happening in his case, which happens to anybody who gets it once it starts, let's just say there's the arch and this is the heel bone back

here. This ligament, called the plantar fascia, is going to run from the heel bone out to the front of the foot. And this is also why he's learned a new gait pattern."); *id.* at 111 (Elwood testifying that he could walk straight "but it puts a lot of pressure in the back area"). As Dr. Gurvis testified, "If something hurts long enough, you start walking funny to avoid walking on the sore spot and you start changing your foot around and walk differently." *Id.* at 180. Although we need not decide the issue on this point, we question whether a reasonable juror could find that the "decision" to walk so as to avoid pain is unreasonable. Also, the record indicates that Elwood attended physical therapy at the instruction of Dr. Kramer to "unlearn[ ] that gait behavior," *id.* at 307, indicating the involuntary nature of the gait.

Regardless of whether Elwood's gait can be described as a "decision," much less an unreasonable one, Elwood's gait cannot support the failure to mitigate instruction because of the lack of evidence that this gait caused Elwood to suffer an identifiable harm not caused by Wilcox's negligent conduct.

Erie argues that the newly discovered injury to Elwood's knee is the identifiable harm caused by Elwood's failure to act reasonably. However, the Simmonses are not asking for damages related to Elwood's potential knee surgery. Indeed, the Simmonses other argument on appeal is that the trial court abused its discretion in denying their motion for a continuance to allow them to establish a foundation for Dr. Ambrose's testimony regarding Elwood's knee condition. As the Simmonses were prevented from establishing damages relating to Elwood's knee condition,[8] we

---

8. We recognize that Dr. Gurvis mentioned that Elwood was "being worked up for a possible, either a total or a hemi knee replacement, on that side which is probably attribut-able to his learned gait pattern, which in turn, has worn down his knee. That's a big change." Tr. at 199. However, no evidence was introduced regarding the cost of this sur-

fail to see how, even if Elwood could be seen to have caused his knee condition, this knee condition could satisfy the identifiable harm requirement of Erie's failure to mitigate affirmative defense.

Based on these considerations we conclude the trial court's instruction on failure to mitigate damages cannot be supported by the evidence introduced at trial relating to Elwood's learned gait.

### C. Alleged Failure to Regularly Use Medications and Orthotics

 Erie also argues that the instruction was supported because: "Dr. Raynor testified that Elwood did well when using his medications and orthotics, yet Elwood did not do so regularly, as evidenced by his comments to both doctors Gurvis and Raynor." Appellee's Br. at 17.[9] This statement is the sole reference Erie makes in its argument section to Elwood's alleged failure to use medications and orthotics. Erie does not cite to any legal authority indicating that Elwood's alleged failure to regularly use his medications and orthotics would support a jury instruction on failure to mitigate damages. Erie also fails to cite to evidence indicating that these alleged failures have aggravated or increased his injuries. *See Nelson v. Marchand,* 691 N.E.2d 1264 (Ind.Ct.App.1998) ("However, the principle of mitigation of damages addresses conduct by an injured party that *aggravates or increases* the party's injuries." (quoting *Wiese–GMC, Inc. v. Wells,* 626 N.E.2d 595, 599 (Ind.Ct.App. 1993), *trans. denied* )) (emphasis in original). Even if it could be inferred that

these alleged failures somehow increased the harm, Erie has also failed to point to evidence establishing the extent of this increase. *See Willis,* 839 N.E.2d at 1189 ("[T]he trial court erred in giving a failure to mitigate instruction because [the defendant] failed to carry his burden to prove that [the plaintiff's] post-injury disregard of advice as to treatment increased [her] harm, *and if so, by how much."* (Emphasis added)).

We conclude the trial court's instruction on failure to mitigate damages cannot be supported by Elwood's alleged failure to regularly take his medications or wear orthotics, without more evidence in the record.

### III. Harmless Error

A review of Indiana case law regarding harmless error analysis in the context of erroneous jury instructions reveals a somewhat inconsistent approach to the issue. *See Forbes v. Walgreen Co.,* 566 N.E.2d 90, 92–93 (Ind.Ct.App.1991) (recognizing the inconsistent approach taken by Indiana courts). The traditional rule was: "The giving of an erroneous instruction is presumed to be harmful, unless the record affirmatively shows that it was not; but the refusal to give an instruction may or may not be harmful." *Ind. Pipe Line Co. v. Christensen,* 195 Ind. 106, 143 N.E. 596, 602 (1924); *see also N.Y., Chicago & St. L. R.R. Co. v. Henderson,* 237 Ind. 456, 483– 84 n. 2, 146 N.E.2d 531, 546 n. 2 (1957) ("Our books are full of cases which hold that … if an instruction is given concerning a fact or set of facts to which no

---

gery, and the Simmonses did not argue at trial that they should be compensated for any injury to Elwood's knee. The thrust of their argument was that Elwood was unable to enjoy his previous quality of life due to the injury to his foot. Had the Simmonses sought damages for the harm to Elwood's knee, our analysis could differ. However, this passing reference to Elwood's potential knee surgery

does not, by itself, serve to support an instruction on failure to mitigate damages.

9. Erie does not support this factual allegation with any citation to the record. This statement in its brief is illustrative of Erie's failure, throughout its argument section, to tie its arguments to the record. *See supra,* note 2.

evidence has been adduced, it will be reversible error unless it clearly appears that the party affected was not harmed thereby." (collecting cases), *reh'g denied,* 237 Ind. 456, 147 N.E.2d 237 (Ind.1958)). Our supreme court has also stated that "[w]e will assume that the erroneous instruction influenced the jury's verdict unless it appears from the evidence that the verdict could not have differed even with a proper instruction." *Canfield v. Sandock,* 563 N.E.2d 1279, 1282 (Ind.1990); *see also Morgen v. Ford Motor Co.,* 797 N.E.2d 1146, 1156 (Ind.2003) (citing *Canfield* for the same rule); *Propst v. Spitznagle,* 215 Ind. 402, 408, 19 N.E.2d 263, 266 (1939) ("In considering the effect of an erroneous instruction this court assumes that the error influenced the result, unless it appears from ... part of the record that the verdict under proper instructions could not have been different."); *City of Decatur v. Eady,* 186 Ind. 205, 115 N.E. 577, 581 (1917) (same); *Estate of Dyer v. Doyle,* 870 N.E.2d 573, 584 (Ind.Ct.App.2007) (citing *Canfield* ), *trans. denied; Pardue v. Seven–Up Bottling Co. of Ind.,* 407 N.E.2d 1154, 1157 (Ind.Ct.App.1980) ("We must assume that the erroneous giving of an instruction on contributory negligence unsupported by any evidence is prejudicial and cause for reversal unless it appears from the record that the error was harmless ... in that the jury was not misled." (Citations omitted)).

This rule is consistent with our supreme court's statement that "[a]n erroneous instruction merits reversal if it *could have* formed the basis for the jury's verdict." *Fleetwood Enters., Inc. v. Progressive N. Ins. Co.,* 749 N.E.2d 492, 495 (Ind.2001) (emphasis added); *see also Baker v. Mason,* 253 Ind. 348, 351, 242 N.E.2d 513, 515 (1968) ("[W]here it appears that the verdict of the jury may have been predicated upon such an instruction [which is not applicable to the evidence], it would be manifestly error to allow the verdict to stand." (quoting *DeHaven v. Helvie,* 126 Ind. · 82, 84, 25 N.E. 874, 875 (1890))); *Summers v. Weyer,* 141 Ind.App. 176, 180, 226 N.E.2d 904, 907 (1967) ("[Instructions] clearly outside the scope of the relevant issuable facts, will be considered reversible error, unless it clearly appears that appellant has not been harmed by their giving. In other words, in order to reverse the decision below, it is [necessary only] for us to determine that the decision of the jury *may* have been based on the giving of the erroneous instructions." (Emphasis added)).

However, our supreme court has also used language contradicting the traditional rule. Our supreme court recently stated that "one seeking a new trial on the basis of an improper jury instruction must show 'a reasonable probability that substantial rights of the complaining party have been adversely affected.'" *Elmer Buchta Trucking, Inc. v. Stanley,* 744 N.E.2d 939, 944 (Ind.2001) (quoting *Peak v. Campbell,* 578 N.E.2d 360, 361 (Ind.1991)). *Stanley* and *Peak* both involved challenges to omitted instructions. *Stanley,* 744 N.E.2d at 944; *Peak,* 578 N.E.2d at 361. These cases thus conform to the traditional rule that a party challenging the trial court's refusal to give an instruction must demonstrate prejudice. *Christensen,* 195 Ind. 106, 143 N.E. at 602. Although the language used in *Stanley* suggests that the rule applies to challenges to erroneous instructions as well, as the case did not involve an erroneous instruction, the language could be interpreted as dicta. However, in *Penn Harris Madison Sch. Corp. v. Howard,* 861 N.E.2d 1190, 1195 (Ind. 2007), our supreme court relied on *Stanley* and *Peak* to state: "Even when a jury is given an incorrect instruction on the law, we will not reverse the judgment unless the party seeking a new trial shows 'a

reasonable probability that substantial rights of the complaining party have been adversely affected.'" (quoting *Stanley*, 744 N.E.2d at 944).[10] This statement contradicts the rule as stated in numerous supreme court decisions, *see Henderson*, 237 Ind. at 483–84 n. 2, 146 N.E.2d at 546 n. 2, including the recent decisions of *Canfield* and *Morgen*.[11] We are thus faced with the difficult question of whether our supreme court in *Penn* sought to overrule its previous decisions and establish a new rule. *Compare Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1352 (Fed. Cir.2002) ("We think it unlikely that the Court meant . . . to overrule by implication this well-settled ripeness jurisprudence, which includes three of its own prior cases."), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir.1999) (recognizing that had the Supreme Court meant to overrule previous caselaw, "we would expect to see more pointed language to that effect"); *Bowles v. Griffin Indus.*, 855 N.E.2d 315, 321 (Ind.Ct.App.2006) ("Had *Paino*[12] meant to either overrule or supersede *Seagram*,[13] we are confident that the *Paino* decision would have at least mentioned *Seagram*."), *trans. denied; and Cassidy v. Padgett*, 99 Ind.App. 239, 190 N.E. 133, 137 (1934) (Kime, J., dissenting) (recognizing that to conclude "the Supreme Court . . . intended to overrule that line of cases . . . without specifically mentioning any of them . . . would be doing an injustice to the Supreme Court") *with In re Custody of G.J.*, 796 N.E.2d 756, 760 n. 5 (Ind.Ct.App.2003) (noting that although a decision by our supreme court "did not mention or explicitly overrule [three decisions of the court of appeals], [t]o the extent [the court of appeals decisions] directly conflict with [our supreme court's decision], . . . they must have been implicitly overruled"), *trans. denied*.

▪ In this case, we need not resolve the conflict as to the proper standard under which we analyze whether an improper instruction necessitates reversal, as we conclude that the giving of the instruction in this case is prejudicial and requires reversal under any of the standards identified above. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 923 n. 13 (9th Cir.2004) (recognizing that although it was not clear whether the Supreme Court had overruled a prior decision, the appellate court did not need to resolve the issue where the result was the same under either case), *cert. denied*, 544 U.S. 948, 125 S.Ct. 1694, 161 L.Ed.2d 524 (2005).

▪ A survey of Indiana cases dealing with erroneous jury instructions on failure to mitigate damages reveals that remand for a new trial is the proper remedy unless the record clearly demonstrates that the instruction did not prejudice the plaintiff. *See Willis*, 839 N.E.2d at 1190 (remanding

---

**10.** We note that this court questioned the strength of presumption of prejudice after the 1970 adoption of Indiana's trial rules, stating that "[r]ecent cases exploring the effect of an erroneous instruction have not stressed a presumption of prejudice, but instead have asked if the appellant was really prejudiced by the instruction and whether the jury was misled." *Old Town Dev. Co. v. Langford*, 349 N.E.2d 744, 769 (Ind.Ct.App.1976), *vacated*, 267 Ind. 176, 369 N.E.2d 404 (Ind.1977) (collecting cases). After granting transfer, our supreme court dismissed the case as moot without further comment. However, our supreme court left the court of appeals decision vacated. 267 Ind. at 176, 369 N.E.2d at 404.

**11.** We note that *Morgen* was decided after *Stanley* and *Peak*.

**12.** *Calvary Temple Church, Inc. v. Paino*, 555 N.E.2d 190 (Ind.Ct.App.1990).

**13.** *Joseph E. Seagram & Sons Inc. v. Willis*, 401 N.E.2d 87 (Ind.Ct.App.1980).

for a new trial based on erroneous instruction regarding failure to mitigate without addressing prejudice or harmless error); *Wilkinson v. Swafford*, 811 N.E.2d 374, 385 (Ind.Ct.App.2004) (remanding for a new trial where a "review of the record as a whole shows that the jury likely allocated fault to [the plaintiff]" based on testimony that was insufficient to support an instruction on failure to mitigate damages), *abrogated on other grounds, Willis*, 839 N.E.2d 1179; *Deible v. Poole*, 691 N.E.2d 1313, 1316 (Ind.Ct.App.1998) (reversing for a new trial where the jury's verdict did not indicate whether it "improperly used the defense of mitigation of damages to find that [the plaintiff] caused the accident or that [the plaintiff] was simply not entitled to any damages as a result of the accident [the defendant] admittedly caused"), *adopted*, 702 N.E.2d 1076 (Ind.1998); *cf. Foster v. Owens*, 844 N.E.2d 216, 222 (Ind. Ct.App.2006) (holding error harmless where the record demonstrated that the jury did not reduce the plaintiff's award based on failure to mitigate), *trans. denied; Indianapolis Athletic Club, Inc. v. Alco Standard Corp.*, 709 N.E.2d 1070, 1077–78 (Ind.Ct.App.1999) (recognizing that any error in giving an instruction on mitigation of damages was harmless because the jury found for the defendant on liability), *trans. denied; Evans v. Schenk Cattle Co., Inc.*, 558 N.E.2d 892, 894 (Ind. Ct.App.1990) (concluding erroneous instruction on failure to mitigate did not require reversal where the jury found the defendant was not negligent; failure to mitigate "became irrelevant because no recovery would be forthcoming"), *trans. denied.*

Here, as the jury instruction did not indicate whether the jury reduced the award based on a theory of failure to mitigate damages, we have no way of knowing whether the jury was improperly influenced by the erroneous instruction.

*See Cahoon v. Cummings*, 734 N.E.2d 535, 541 (Ind.2000) (remanding for a new trial where it was not knowable whether the jury's award was based on erroneous instructions). In closing argument, counsel for Erie discussed at length Elwood's alleged failure to mitigate damages. *See* Tr. at 429 (discussing the "ninety to ninety-five percent success rate" of the surgery identified by Dr. Gurvis); *id.* at 433 (discussing the refused spinal tap, and stating "[i]t's a mitigation issue for you to think about"); *id.* at 436 (mentioning mitigation of damages in relation to Elwood's gait); *id.* at 438 ("So he can't recover for conditions he could have helped cure."). Therefore, the issue of mitigation of damages was emphasized for the jury, and the likelihood that the matter was discussed and impacted the jury's verdict is significant.

Under these conditions, we conclude that the trial court's erroneous instruction was not harmless error. Therefore we must remand for a new trial.

*Conclusion*

We conclude the trial court abused its discretion in instructing the jury on the affirmative defense of failure to mitigate damages. We also conclude that this error was not harmless and therefore reverse and remand for a new trial.

Reversed and remanded.

BAKER, C.J., and RILEY, J., concur.